| | |
|---|---|
| TUTOR PERINI CORP., <br><br>                 Plaintiff, <br><br> v. <br><br> BANC OF AMERICA SECURITIES LLC, now known as Merrill Lynch, Pierce, Fenner & Smith Incorporated, successor by merger, and BANK OF AMERICA, N.A., <br><br>                 Defendants. | COMPLAINT |

**Preliminary Statement**

1.     Tutor Perini Corporation ("Tutor Perini")[1] brings this Complaint against Banc of America Securities LLC, now known as Merrill Lynch, Pierce, Fenner & Smith Incorporated, successor by merger ("BAS"), and its affiliate Bank of America, N.A. ("Bank of America") (together, the "defendants") to recover nearly $100 million that BAS wrongfully invested—with the knowledge and acquiescence of Bank of America—in toxic auction-rate securities ("ARS") that are now frozen.

2.     Tutor Perini instructed BAS, which served as Tutor Perini's investment advisor and broker, to invest only in safe and liquid securities, because it needed ready access to the funds to conduct its operations.  BAS pitched ARS as a money market alternative.  BAS touted ARS as safe and liquid investments, suitable for a risk-averse investor like Tutor Perini whose investment objectives, as defendants well knew, were preservation of capital and liquidity.

---

[1] The brokerage account at issue here was opened in 2004 by Perini Corporation, Tutor Perini's predecessor.  For ease of reference herein, we refer to the current account-holder, Tutor Perini.

3.      Yet, at the very time that BAS was investing Tutor Perini in ARS, BAS was both aware of serious risks in ARS that made them completely unsuitable for Tutor Perini and privately bemoaning the myriad risks ARS posed to the defendants.  BAS tried to rid itself of ARS at the same time it was buying ARS for Tutor Perini, without ever disclosing its real view of ARS as an investment.  Indeed, in January 2008 BAS purchased hundreds of millions of dollars of ARS for Tutor Perini—overwhelmingly from its own inventory—yet Bank of America had also prepared warnings to send clients about just such investments, which it shared with BAS but which neither defendant ever shared with Tutor Perini.  They failed to do so because the defendants stood to profit from keeping the truth from Tutor Perini and other clients, so that the defendants could foist the risky ARS securities from their own balance sheet and on to those of their clients.  To quote one employee of defendants, anyone who wants to alert a client to the facts of the ARS market "should be shot."

4.      Commencing in August 2007 and lasting until February 2008 when the entire ARS market collapsed, defendants were abundantly aware of risks of illiquidity in the ARS market, which they did not disclose to Tutor Perini.  During this critical period, the defendants knew that the risks associated with investing in ARS were increasing exponentially, understood that the ARS market as a whole was in danger of collapse, and internally monitored the risk of the widespread auction failures to come.  Neither BAS nor Bank of America disclosed these risks to Tutor Perini.  Instead, at the very time these risks became palpable, BAS pitched ARS to Tutor Perini and invested hundreds of millions of dollars of Tutor Perini's funds in ARS.  These purchases were against Tutor Perini's interest, as defendants knew, but served defendants' undisclosed financial interests.

5.      Specifically, beginning in the summer of 2007, a month before BAS pitched ARS to Tutor Perini, the ARS market underwent a dramatic shift in risk profile. Scores of auctions for ARS backed by collateralized debt obligations ("CDOs") and credit linked notes ("CLNs") failed for the first time. The holders of those ARS thus could not sell their securities at auction and would not be able to recover their principal for years, at best. The illiquidity that plagued ARS backed by CDOs and CLNs infected ARS backed by other collateral, including student loans and municipal bonds.

6.      In order to forestall a mass failure of the entire ARS market, throughout the fall of 2007 and into the winter of 2008, BAS propped up the ARS market artificially by submitting bids at auction after auction for its own account. In so doing, BAS was acting to stave off auction failures and to perpetuate the false illusion of true investor demand—and therefore liquidity—in the ARS market. Yet BAS knew that such artificial support by BAS and other banks across Wall Street was unsustainable, and that it masked the heightened risk of failure. Indeed, as BAS knew, it and other banks could not continue to use their balance sheets to prop up the market to create the illusion of liquidity. Moreover, BAS as a further means of covertly supporting the ARS market so that it would appear to investors to be safer than it was, entered into secret side deals with ARS issuers to ensure that auctions did not fail due to lack of demand.

7.      During this whole time, defendants uttered not a word of these risks to Tutor Perini. Instead, BAS sold hundreds of millions of dollars in ARS to Tutor Perini in a calculated effort to move these risky securities off its own balance sheet. BAS' false assurances to Tutor Perini that BAS would continue to support the market and that ARS were an appropriate investment for it enabled BAS to offload ARS on to Tutor Perini and off its own books.

8.     Had the risks that the defendants knew been disclosed to Tutor Perini, Tutor Perini would never have invested in ARS, since the negligible conceivable advantage of ARS was grossly outweighed by the downside risks known to the defendants.

9.     In February 2008, the very risk that the defendants had concealed from Tutor Perini materialized:  the market for the ARS held by Tutor Perini collapsed.  Tutor Perini now holds more than $99.6 million in frozen ARS that will not mature for decades, all as a result of defendants' actions from September 2007 through February 2008.

10.     BAS' misconduct has been noticed by regulators: BAS has been the subject of multiple investigations regarding the improper ARS sales practices set forth herein.  BAS has been investigated by, among others, the Securities and Exchange Commission ("SEC") and the North American Securities Administrators Association, a group representing more than a dozen state attorneys general.  It has entered into settlements resulting from these investigations, and been required to repurchase ARS—at full face value—from all of its individual retail clients and smaller institutional investors at a cost of billions, and to pay tens of millions in fines.  The settlements also require that BAS provide liquidity solutions to institutional investors like Tutor Perini.

11.     Despite compelling evidence of the defendants' breach of state and federal laws resulting from its failure to meet its obligations to Tutor Perini, the defendants have refused to accept any responsibility for their actions.  The defendants have yet to provide Tutor Perini with any redress for the impairment and illiquidity of the ARS in Tutor Perini's account, which remain frozen.

**The Parties**

12.     Plaintiff Tutor Perini is a corporation organized under the laws of Massachusetts and headquartered in Sylmar, California.  Tutor Perini is a leading building construction company, offering diversified general contracting and design and building services to private clients and public agencies throughout the world.

13.     Defendant BAS, now known as Merrill Lynch, Pierce, Fenner & Smith Incorporated, successor by merger, was at all relevant times an investment banking company registered in Delaware with its principal place of business in New York.  At all relevant times, it was the wholly-owned subsidiary of Bank of America Corporation, a major global banking institution.  At all relevant times, BAS was a member of the Financial Industry Regulatory Authority ("FINRA") and registered as a broker-dealer with the SEC.

14.     Defendant Bank of America is registered in Delaware and has its principal place of business in North Carolina.  Bank of America, like BAS, is a wholly-owned subsidiary of Bank of America Corporation.

**Factual Background**

I.      Tutor Perini's Investment Mandate to BAS, and
        Relationship to Bank of America

15.     Tutor Perini has had a long business relationship with defendants.  From the outset of their relationship in 2004, Tutor Perini's treasurer told its principal broker at BAS, its principal investment advisor, its conservative investment strategy.  Tutor Perini was interested in investing only in liquid securities of the highest credit quality because it needed cash to be available to fund its operations.  Consistent with these investment objectives, Tutor Perini invested in conservative, highly liquid instruments.  Tutor Perini did not invest in stocks and

speculative securities, particularly since it was a building company, not a financial company, and needed its cash to be secure so it could be used for its operations.

16.     The defendants well knew Tutor Perini's conservative investment mandate. As defendants knew, Tutor Perini had always been a conservative investor that required cash to be available on short notice to fund operations as well as potential merger and acquisition activity. As defendants also knew, Tutor Perini's financial difficulties in the 1990s reinforced its culture of rigorous discipline when it came to cash management.

17.     As the lead bank in Tutor Perini's lending group, Bank of America was well aware of Tutor Perini's risk averse cash management philosophy and overriding objectives of safety and liquidity. Indeed, Bank of America was intimately familiar with Tutor Perini's financial situation and cash strategy. As defendants knew, Tutor Perini chose Bank of America because of its expertise and expressions of loyalty to Tutor Perini in fostering its financial goals. As a result of these relationships, Bank of America lulled Tutor Perini into believing that the defendants could be trusted and would not act in a way adverse to their client, Tutor Perini.

II.     The ARS Market and BAS' Role in It

18.     ARS are a type of bond. They are variable-rate securities backed by a variety of collateral. The interest rates reset at regular intervals—typically 7, 28 or 35 days—through a "Dutch" auction process in which the lowest bid rates prevail. The securities themselves have long maturities, often 30 or 40 years. For example, in Tutor Perini's account currently, there are ARS that are not scheduled to mature until August 1, 2057. In resetting the interest rate so frequently at auction, ARS allow issuers to access long-term debt at short-term rates.

19.     At an auction, prospective buyers submit bids to an auction agent.  Each bid consists of the par value of the securities that the buyer wishes to purchase and the minimum interest rate that the buyer is willing to accept.  At a successful auction, ARS trade at par.

20.     Each ARS is subject to a maximum interest rate that the issuer will pay to the holder of the security.  Bids in an auction must be at or below the maximum interest rate in order to be accepted.  On the day of the auction, the auction agent collects all of the bids and determines whether there are sufficient bids below the maximum rate to cover all of the outstanding securities.  If there is sufficient demand, the auction agent deems the auction successful and sets the interest rate for all of the securities at the lowest interest rate necessary to result in the sale of all the securities (the "clearing rate").  If there are not sufficient bids below the maximum rate to cover all securities offered, the auction agent declares a "failed auction."

21.     When an auction fails, the current holders who attempted to sell their securities are forced to hold them until the next auction.  If auctions continue to fail, holders of the securities may have to hold the securities until they mature, often decades later.

22.     Additionally, when an auction fails, the interest rate cannot be set through the auction process, and thus the auction agent sets the rate at a level specified in the offering documentation for the particular ARS.  This interest rate is known as the "default rate."

23.     For many ARS, the default rate is significantly higher than the prevailing interest rate.  High default rates are designed to promote successful auctions by making failed auctions financially unattractive to issuers of ARS, and to encourage those issuers to redeem failed ARS rather than pay the default rate.  This mechanism provides a purchaser with a type of built-in insurance, as well as additional compensation in the event of a failed auction.  However, the default rate for ARS backed by student loans is often far below the rate set on other types of

ARS.  The interest on student loan ARS is paid from the proceeds of the student loans themselves; thus, the interest paid on student loan securities generally cannot, in the long term, exceed the market interest rates on the underlying loans.

24.     Student loan ARS comprise all but one of the ARS that remain frozen in Tutor Perini's BAS account today.  As a consequence of the low default rates on student loan ARS, holders of these securities, such as Tutor Perini, have suffered a prolonged loss of liquidity and a potentially reduced return on their now illiquid holdings.  Since the widespread failure of auctions in February 2008, the majority of ARS backed by municipal debt have been redeemed, thereby providing liquidity and principal to the holder of those securities.  By contrast, very few student loan ARS have been redeemed because issuers pay below-market interest on those securities and have no incentive to redeem them.  In addition, the fact that some student loan ARS were undercapitalized exposed holders of these securities to additional undisclosed ratings and pricing risks.  Thus, the holders of student loan ARS, such as Tutor Perini, have suffered greater economic harm as a result of the auction failures than holders of ARS backed by other collateral.

25.     BAS acted as an underwriter and auction dealer, lead manager, trustee, and auction agent on numerous ARS issues, including those issued by student loan entities and municipalities.  Indeed, BAS was a top originator and underwriter of student loan ARS.  As a leading underwriter and auction dealer, BAS was responsible for marketing and selling the securities to investors.  When acting as a manager in auctions, BAS would submit bids into the auction on behalf of its clients and any other broker-dealers who wanted to bid at the auction.  As trustee, BAS was responsible for gathering and disseminating investment information to security

holders.  Finally, when acting as an auction agent, BAS was responsible for running auctions and calculating the appropriate interest rate.  BAS earned significant sums in all of these roles.

26.  BAS was the lead broker-dealer, also known as the auction dealer, on all but one of the ten ARS that remain frozen today in Tutor Perini's account.[2]  BAS was also lead manager or co-lead manager for eight out of these ten ARS.[3]

27.  On information and belief, Bank of America also was intimately familiar with the ARS market, as it invested in ARS for its own clients with fiduciary accounts.  On information and belief, Bank of America also had access to information about the ARS market generated by its affiliate BAS.

III.  The Defendants' Misrepresentations and Omissions Regarding ARS

28.  BAS first purchased ARS for Tutor Perini in September 2007, precisely at a time when ARS made no sense as an investment for Tutor Perini and when BAS was well aware of risks of illiquidity in the ARS market.  It was after the unprecedented August 2007 ARS failures that BAS first invested Tutor Perini into the ARS market.  But that is precisely when it should have been getting conservative customers like Tutor Perini out of that market.

29.  From September 2007 through February 2008, BAS, through the principal investment advisor and broker for Tutor Perini's account, misrepresented the nature and risks of those securities to Tutor Perini's treasurer and the defendants concealed key, material information about the securities from Tutor Perini.  Indeed, despite the frequent communications

---

[2] BAS was the lead broker-dealer for the following nine securities that remain frozen in the Tutor Perini account (identified by their CUSIP numbers):  63544DAL6; 63544EAL4; 64032FAKO; 78443GAH8; 10620NBB3; 36156YAR2; 36156YAS0; 698476EE4; and 13033WWZ2.

[3] BAS was the lead manager for the following eight securities that remain frozen in the Tutor Perini account (identified by their CUSIP numbers): 63544DAL6; 63544EAL4; 64032FAKO; 78443GAH8; 36156YAR2; 36156YAS0; 698476EE4; and 13033WWZ2.

between Tutor Perini and both its investment advisor and its credit-side relationship team at Bank of America, the defendants never alerted Tutor Perini to the material risks described below.

30.     *First,* although BAS knew ARS were long-term bonds and posed significant liquidity risks, BAS equated ARS with money market funds and referred to them as "7-day," "28-day," or "35-day" securities, rather than as long-term investments. These representations were misleading, particularly after August 2007 for the reasons noted herein. Nevertheless, BAS misrepresented to Tutor Perini that ARS were safe, liquid, and a good alternative for its cash holdings.

31.     *Second,* the defendants knew in August 2007 and thereafter that the ARS market was experiencing an unprecedented upheaval. In September 2007, BAS falsely represented the risks posed by such failures. They represented misleadingly that there had been no auction failures in the history of the student loan and municipal ARS market, and thus any August failures were unrelated to the portion of the market it would now invest in with Tutor Perini's money. Even though BAS officials privately feared contagion from the failed auctions to student loan and municipal ARS, BAS claimed to Tutor Perini that the August auction failures were due to the poor credit quality of those particular securities.

32.     But the defendants were well-aware and privately concerned about auction failures throughout the ARS market, including in the securities touted to Tutor Perini. For instance, in contrast to the representation that the August failures would have no effect on the rest of the ARS market, a senior BAS official stated on August 17, 2007—nearly a month prior to BAS sale of ARS to Tutor Perini—reacting to these unprecedented auction failures in August 2007, that if the liquidity crisis continued, it could trigger a "meltdown" in ARS. Indeed, the defendants knew, but did not disclose to Tutor Perini, that after August 2007 the liquidity in the

ARS market was largely illusory.  The risk of contagion from those August failures was well understood: On November 20, 2007, a BAS manager wrote that "quite a few issues in the student loan market have come precariously close to failing and probably would have were it not for dealers showing clearing bids just thru max rate."  Those risks were not disclosed to Tutor Perini; instead BAS purchased just those securities for a conservative investor.[4]

33.     At no time up through the failure of the entire ARS market in February 2008 did the defendants ever disclose to Tutor Perini that the auction failures in the CDO and CLN segment of the ARS market dramatically increased the risk of auction failure in the student loan and municipal ARS it purchased for Tutor Perini.  BAS continued to purchase hundreds of millions dollars of student loan and municipal ARS in December and January 2007-08, when BAS knew full well that that market faced severe liquidity risk.  BAS privately was acting on this risk to protect itself.  On December 6, 2007, a BAS risk manager became so concerned about BAS' "ability to keep the Auction Rate programs floating" and about the related risk that BAS would be stuck with illiquid ARS for years to come, that he recommended BAS rid itself of all ARS holdings.  He wrote that BAS should "make sure that we don't hold any ARS on our balance sheet.  We have $1.43 BN right now and given the precarious nature of these, once we have a failed auction, the ultimate maturity is a question."  A week later, on December 12, 2007, the same risk manager issued another warning about a meltdown in the ARS market.  He wrote:

> The ARS book could get ugly. . . .the likelihood of some of these investors pulling out of these deals is very real.  Once we have a failed auction, other will most likely follow.  Reputation risk to [Bank of America Corporation] is high in this space right now.  Very high.

34.     None of these risks were shared with Tutor Perini.

---

[4] BAS purchased $8,000,000 in ARS for the Tutor Perini account in September 2007; $147,200,000 in ARS in October 2007; $206,315,000 in ARS in November 2007; $101,175,000 in ARS in December 2007; $261,670,000 in ARS in January 2008; and $8,100,000 in ARS in February 2008 before the auctions began to fail.

35.    *Third*, BAS never disclosed its financial interest in falsely representing the ARS market to Tutor Perini.  BAS led Tutor Perini to believe that its interests were fully aligned with its client.  That was false.  When the ARS market began to founder in August 2007, BAS could either advise its conservative clients like Tutor Perini of the risks or could keep them in the dark.  It chose the latter since that served its economic interests, though not those of its clients.  By failing to reveal the risks, and affirmatively misrepresenting them, BAS could both keep earning immense fees on the investment banking side of its ARS business and avoid having to use its own balance sheet to purchase ARS (and instead use those of its clients) to keep the ARS market afloat.  Bank of America, too, led Tutor Perini to believe that its sole interest, as Tutor Perini's lead lender, was in the liquidity and security of Tutor Perini's holdings.  It never disclosed its competing interest in protecting the defendants' balance sheets and standing in the market.

36.    *Fourth*, because of its multiple roles in the ARS market—including in the securities that it purchased for Tutor Perini's account—BAS had access to far superior information than Tutor Perini about the demand for ARS.  The defendants knew that as of August 2007, BAS placed necessary support bids in every auction for which it was the lead broker-dealer, also known as the auction dealer, so as to maintain the illusion of liquidity in the absence of genuine investor demand, and that other banks followed similar practices.  In late August, discussing the possibility of an auction failure, a BAS trader warned her colleagues:  "If we do not support this deal we anticipate a significant amount of selling in our . . . student loan deals and our insured municipal deals."  Yet the defendants did not tell Tutor Perini that genuine liquidity in the market had evaporated and that therefore without bank support, the auctions for ARS would fail.

37.     Indeed, unbeknownst to Tutor Perini, BAS continued to place support bids, at an accelerating pace through the end of 2007 and the beginning of 2008 to foster the illusion of liquidity, until it (along with other banks which were also engaged in this practice) abruptly determined to cease that practice in February 2008, leading to failed auctions across the ARS market.

38.     *Fifth*, in the fall of 2007, BAS knew that its own inventory of ARS was ballooning as a result of its support bids placed to prevent auctions from failing. As a result, BAS knew its balance sheet was facing unsustainable stress. Thus, in the fall of 2007, BAS inventory of ARS reached triple the level of inventory it held during the same time period of the previous year. As early as October 5, BAS's risk manager warned: "[W]e are very outsized in our exposure to student loans."

39.     By December, the matter was dire. On December 11, 2007, a BAS senior executive reviewing BAS' efforts to reduce its holdings of ARS warned that BAS was reaching the limit of its ability to bid in auctions and support the market. Six days later, on December 17, a BAS senior executive instructed the manager in charge of the ARS Desk to "leave no stone unturned in marketing ars [sic] to our long term investor base ASAP" because BAS needed to reduce its own inventory. In January 2008, the ARS Desk was "actively discounting" ARS it had previously supported, including two student loan ARS, in order to reduce BAS' own ARS inventory to encourage sales of ARS off its books.

40.     The defendants did not disclose to Tutor Perini the unsustainable use of BAS' balance sheet. They did not reveal that the growth in inventory far outpaced seasonal variation in prior quarters and years and that BAS could not sustain its support of the ARS market for which it was the lead broker-dealer.

41.     Instead of disclosing these facts, BAS purchased for Tutor Perini more than $330 million in ARS for which BAS was the lead broker-dealer between December 2007 and the last ARS purchase BAS made for Tutor Perini's account in February 2008 before the auctions failed. Indeed, during this time period—precisely while BAS was desperately seeking to reduce its own exposure to ARS—BAS was the lead broker-dealer on every ARS purchase for the Tutor Perini account but one, for which this information is available.[5]

42.     By falsely touting to Tutor Perini the safety of its own ARS, BAS kept hundreds of millions of dollars of additional ARS inventory from its balance sheet, shifting the burden and risk to its customer, Tutor Perini. Furthermore, during this critical time period, BAS through its account representative misrepresented to Tutor Perini that the reason it moved ARS off its own books and offered those ARS to clients at a discount was due solely to BAS' year-end and quarter-end "window dressing" effort—without uttering a word about its true reason, namely to reduce exposure to ARS securities that were at increasing risk of becoming illiquid.

43.     *Sixth*, BAS—and on information and belief Bank of America—knew but did not disclose to Tutor Perini that ARS interest rates in the fall and winter of 2007 were approaching the maximum rates permissible for the securities. They knew that the rates were far above those for otherwise comparable products—strong indicators of increased risk, decreased liquidity, and added potential for auction failures. Historically, student loan ARS traded at or just below the one-month London Interbank Offered Rate ("LIBOR"). During the fall of 2007, the spreads between LIBOR and student loan ARS grew to unprecedented levels. As BAS and other banks

---

[5] BAS was the lead broker-dealer for at least the following securities purchased for the Tutor Perini account between December 2007 and February 2008 (identified by their CUSIP numbers): 78443GAH8; 78442GEV4; 698476EE4; 657902Y48; 657902U75; 65337MAZ1; 64032FAKO; 63544EAL4; 63544DAL6; 63544DAD4; 574217VK8; 574217H24; 574217G66; 574217G58; 574217A47; 41415WBM3; 36156YAS0; 36156YAR2; 24S388-LA8; 235364AA4; 232286BE3; 167505BD7; 167505BC9; 160853LN5; 160853JK4; 160853JE8; 14483RAF4; 13033WWZ2; and 10620NBB3.

that tracked such matters understood, this was a strong indicator of waning market demand, as the small numbers of investors who knew the risks bid up the interest rates at auction, and the banks placed support bids at or just below the maximum rate to prevent the auctions from failing.

44. At least by late 2007, BAS began compiling and calculating maximum rates for the ARS in its inventory, and knew that ARS with low maximum rates were at greater risk of failure than others. The defendants did not disclose any of this information to Tutor Perini.

45. *Seventh*, BAS was aware of, but did not disclose to Tutor Perini, frequent waivers of the maximum interest rates on ARS—so-called "maximum rate waivers"—which disguised flagging demand and staved off auction failure (at least temporarily) by permitting auctions to clear at higher rates. Indeed, by December 2007, issuers in BAS auctions had executed an astounding 48 maximum rate waivers. At the same time, these waivers resulted in a higher short-term interest rate, which could serve as an enticement to less sophisticated investors. Increased dependence on maximum rate waivers—which were rarely used prior to August 2007—was a clear sign of the heightened risk of auction failures.

46. BAS, and on information and belief, Bank of America, were aware of the widespread resort to maximum rate waivers after August 2007. BAS supported and facilitated these waivers, but the defendants did not disclose their existence or the risks they presented to Tutor Perini.

47. *Eighth*, despite knowing all these risks—including the unsustainable use of its own balance sheet to buy inventory—in winter 2007, the BAS broker on the Tutor Perini account represented to Tutor Perini's account manager that BAS would continue to support the auctions for the ARS that it sold to Tutor Perini. Specifically, BAS led Tutor Perini to believe that because BAS was the market-maker for the ARS it sold to Tutor Perini, it would not withdraw its

support of the auctions. Indeed, the BAS broker made this same misrepresentation to Tutor Perini on the very eve of withdrawing its support from the ARS market in February 2008.

IV.    The Defendants' Stratagem To Offload ARS Onto Clients

48.    BAS knew that it needed to encourage client demand in ARS so that BAS would not have to take on even more ARS inventory. Instead of educating its brokers about the increasing risks of ARS, however, BAS encouraged them to promote ARS to clients. Indeed, BAS provided them an incentive to do so: sales representatives earned sales credits on ARS sales to customers while they did not earn any such credits on sales of CDs or money markets. The defendants did not disclose this incentive structure to Tutor Perini.

49.    On August 29, 2007, the BAS ARS Desk organized a student loan "Teach-In" to give the retail sales force information about student loan ARS. The "Teach-In" material praised the retail sales representatives for selling student loan ARS to retail customers. The materials stated: "Your focus on distributing ARS to retail accounts has greatly benefited BAS' student loan effort." The "Teach-In" dismissed concerns about market risks and said that student loans were particularly good investments. The "Teach-In" failed to explain that the high ARS interest rates reflected a deteriorating market for ARS and increasing risk of auction failures and loss of liquidity. The "Teach-In" minimized ARS risk by stating that the customer's principal investment in ARS was secure because "rating agencies have never downgraded a student loan backed transaction" and stating that "there is virtually no interest rate risk in student loan ARS." The "Teach-In" materials, however, failed to convey to the sales staff the increased liquidity risks in student loan ARS, which the defendants then well knew. As the fall of 2007 wore on, the pressures on BAS to reduce its own exposure to ARS intensified. On November 21, 2007, the manager in charge of the BAS ARS Desk stated that he was taking steps to reduce BAS' own

exposure to ARS risk through (1) "aggressive marketing" to institutional customers; (2) communicating to the sales force an expectation of better interest rates prior to auctions; and (3) offering discounts to buyers of BAS' own ARS holdings in the secondary market.

50.     In providing the sales force with misleading information to convey to customers and failing to train its brokers on the true risks of ARS, BAS violated NYSE and NASD rules, which require, inter alia, that every member "[s]upervise diligently all accounts handled by registered representatives" (NYSE Rule 405); "establish, maintain and enforce written procedures to supervise the activities of each registered representative that are reasonably designed to achieve compliance with the applicable securities laws and regulations, and with the applicable rules of the NASD" (NASD Conduct Rule 3010); and create adequate supervisory procedures and develop procedures to test and control the supervision (NYSE Rule 342).  BAS' failure to exercise the required supervision over Tutor Perini's account, including the sales staff who worked on it and the supervisors of those individuals, enabled BAS to defraud Tutor Perini of nearly $100 million.

V.      <u>Bank of America Drafts An ARS Risk Disclosure And Shares It
        With BAS, But Defendants Failed To Send It To Tutor Perini</u>

51.     Bank of America and defendants realized that they had to alert their clients to the risks of ARS, and circulated internally a disclosure for their clients.  That disclosure warned of the ARS risks at a time that Tutor Perini could have gotten out of the market.  But, astoundingly, neither defendant ever sent that disclosure or communicated its contents to Tutor Perini.

52.     On January 23, 2008, the Chief Investment Office for a part of Bank of America issued an alert sent with high importance to its investment professionals recommending that portfolio managers begin eliminating their clients' exposure to ARS.  Several retail sales representatives forwarded the alert to the traders on the ARS Desk at BAS.  As a sign of the

conflicting interests within the defendants, one senior member of the BAS ARS Desk staff reacted by stating: "Whoever sent this out should be shot!! Are they trying to put us out of business?" In line with that sentiment, rather than taking action to protect BAS clients, the alert was never sent to Tutor Perini. On January 28, 2008, the US Trust Chief Investment Office issued a second alert reiterating its unequivocal warning to portfolio managers to take their customers out of the ARS market. Yet despite two clear alerts and learning that other broker-dealers were about to leave the ARS market, BAS continued to encourage customers, including Tutor Perini, to hold ARS.

53.     On information and belief, the failure of Bank of America to pass the alerts on to its long-standing client Tutor Perini constitutes evidence of an agreement between the defendants to defraud Tutor Perini. The defendants, by their conspiracy of silence, kept Tutor Perini in the dark about the risks of ARS and allowed Tutor Perini to rely on the fraudulent misrepresentations by BAS about the liquidity of these securities.

54.     Tellingly, at the time of these alerts in January 2008, BAS purchased more than $250 million in ARS for Tutor Perini's account. $227.07 million of this amount was purchased from BAS' own inventory, and represented 23 securities as to which BAS was the lead broker dealer.

55.     On information and belief, defendants acted in unison as Tutor Perini's longtime, trusted lead lender and as Tutor Perini's ARS dealer—which Tutor Perini used as its broker dealer as a result of Bank of America's recommendation that it do so—to achieve this unlawful purpose by exercising a particular power of coercion over Tutor Perini they would not have had if acting independently.

VI.    The Mass ARS Auction Failures In February 2008

56.    At the end of January and beginning of February 2008, various broker dealers allowed several ARS auctions to fail. Over the February 9th weekend, BAS considered whether to continue supporting the ARS market. On February 11, 2008 and in the days that followed—at the same time it was continuing to buy ARS for Tutor Perini's account—BAS determined that it could no longer afford to maintain the charade and allowed its auctions to fail. At that time, Tutor Perini held close to $200 million in ARS with BAS.

57.    Nearly three years later, the ARS market is still frozen, leaving investors like Tutor Perini without access to their funds. Currently, Tutor Perini holds more than $99.6 million in ARS frozen in its BAS account.[6]

**FIRST CAUSE OF ACTION**
**(Violation of Section 10(b) of the Securities Exchange Act of 1934**
**and SEC Rule 10b-5; fraud and unsuitability)**

58.    Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

59.    The defendants, through the use of instrumentalities of interstate commerce, intentionally and recklessly violated Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, which make it unlawful to engage in deceptive practices, to make any untrue statement of a material fact, or misleadingly to omit to state a material fact in connection with the purchase of securities. Tutor Perini reasonably relied on the defendants' statements and omissions, which have caused Tutor Perini significant financial harm.

---

[6] After the ARS auctions began to fail en masse in February 2008, Tutor Perini was able to liquidate some of its holdings including through occasional redemptions by ARS issuers for securities in the Tutor Perini account. As a result, the par value of the frozen ARS in Tutor Perini's account decreased since the time of the failures to its present amount of nearly $100 million.

60.     By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if the defendants had not violated Tutor Perini's mandate, to wit:  an order directing the defendants to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

## SECOND CAUSE OF ACTION
### (Common Law Fraud - Intentional Misrepresentation)

61.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

62.     But for BAS' unlawful misrepresentations and omissions, Tutor Perini would never have allowed BAS to invest the company's money in ARS.

63.     Tutor Perini justifiably relied upon BAS' intentionally untruthful statements that BAS would follow Tutor Perini's instructions and invest Tutor Perini's money in conservative and liquid securities, and BAS intended that Tutor Perini would so rely.

64.     By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if BAS had not violated Tutor Perini's mandate, to wit:  an order directing BAS to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

## THIRD CAUSE OF ACTION
### (Common Law Fraud - Fraudulent Concealment)

65.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

66.     Having represented to Tutor Perini that ARS investments were safe and liquid and that BAS would continue to support the ARS market, BAS was duty bound to disclose all material facts to Tutor Perini so as to render these statements not misleading.

67.     With intent to defraud Tutor Perini and thereby to profit from the increased fees and commissions to be realized from ARS investments and to reduce their own exposure, the defendants intentionally and unlawfully concealed from Tutor Perini the fact that investments were being made in securities with rapidly increasing liquidity risks.

68.     By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if the defendants had not violated Tutor Perini's mandate, to wit:  an order directing BAS to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

69.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

70.     Through negligence, BAS misrepresented the suitability of ARS for Tutor Perini's account and failed to inform Tutor Perini of the risks associated with ARS in late 2007 and early 2008.

71.     Tutor Perini reasonably relied on BAS statements and omissions, which has caused Tutor Perini significant financial harm.  By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if the defendants had not violated Tutor Perini's mandate, to wit:  an order directing the defendants to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

## FIFTH CAUSE OF ACTION
### (Violation of M.G.L. c. 93A)

72.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

73.     Section 11 of the Massachusetts Consumer Protection and Unfair Trade Practices Act M.G.L. ch. 93A §1 et seq., makes it unlawful for "any person who engages in the conduct of any trade or commerce . . . [to engage in] . . . an unfair method of competition or an unfair or deceptive act or practice. . ." Section 11 further provides that any person who engages in trade or commerce and who suffers any loss of money or property as a result of such conduct is entitled to multiple damages, attorneys' fees, costs and equitable relief.

74.     Tutor Perini, BAS, and Bank of America are "persons" engaged in the conduct of trade or commerce within the meaning of M.G.L. ch. 93A §§1 and 11.

75.     The defendants' failure to inform Tutor Perini about material information of which it was aware and BAS' affirmative misrepresentations to Tutor Perini constitute unfair and deceptive acts or practices in violation of M.G.L. ch. 93A, §2.

76.     The defendants' actions are knowing and willful violations of M.G.L. ch. 93A, §2.

77.     The defendants' unfair and deceptive acts and practices occurred primarily and substantially within the Commonwealth of Massachusetts. Tutor Perini was based in Massachusetts, as were defendants' representatives; all relevant communications between Tutor Perini and the defendants were made in, to, or from Massachusetts; Tutor Perini met with defendants' representatives in Massachusetts; and the harm was incurred by Tutor Perini in Massachusetts.

78.     As a result of the defendants' unfair and deceptive acts and practices, Tutor Perini has suffered and will continue to suffer harm, including monetary damages.

79.     As a direct and proximate result of the foregoing knowing, willful and deceptive acts and practices of the defendants, Tutor Perini is entitled to an order directing the defendants

to remit to Tutor Perini three times the full par value, plus accrued interest, of the ARS in its account with BAS, as well as recovery of its reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy – Substantial Assistance)

80.     Plaintiff repeats and re-alleges paragraphs 1-57, 62-64 and 66-68  hereof with the same force and effect as if here set forth at length.

81.     Defendants reached an agreement, and acted in concert to commit the acts of fraud described in the Second and Third Causes of Action.

82.     In connection with the conduct alleged above, defendants gave substantial assistance and encouragement to each other with the knowledge that such assistance was contributing to a common plan to defraud Tutor Perini.

83.     BAS provided misleading and fraudulent information to Tutor Perini and omitted material information about the ARS that it purchased for Tutor Perini's account.  BAS and Bank of America together failed to correct this misleading and fraudulent information or to disclose the risks associated with ARS to Tutor Perini, despite both knowing that the securities were unsuitable for Tutor Perini and that Tutor Perini had been provided misleading and fraudulent information by BAS about the liquidity of these securities and not been told the true market risks of the securities.

84.     As a direct and proximate result of the defendants' civil conspiracy, Tutor Perini has been damaged and will continue to be damaged.

85.     By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if defendants had not engaged in such a conspiracy, to wit:  an order directing defendants to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account with BAS.

## SEVENTH CAUSE OF ACTION
### (Civil Conspiracy – Coercion)

86.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

87.     Defendants acted jointly for an unlawful purpose by moving ARS out of BAS' inventory into Tutor Perini's account while reaping the joint benefits of having Tutor Perini as a client for BAS and a borrower for Bank of America.

88.     Acting in unison as Tutor Perini's ARS dealer and lead lender, defendants exercised coercion over Tutor Perini that they would not have had if they had been acting independently.

89.     As a direct and proximate result of the defendants' civil conspiracy, Tutor Perini has been damaged and will continue to be damaged.

90.     By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if defendants had not engaged in such a conspiracy, to wit:  an order directing defendants to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account with BAS.


## EIGHTH CAUSE OF ACTION
### (Violation of M.G.L. c. 110A, sec 410(a)(2))

91.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

92.     BAS sold ARS to Tutor Perini in Massachusetts by means of unlawful misrepresentations and omissions.

93.     BAS knew or in the exercise of reasonable care should have known that its representations to Tutor Perini regarding ARS were untrue and that it was withholding material information from Tutor Perini.

94.     Tutor Perini did not know the truth, and but for BAS' unlawful misrepresentations and omissions, Tutor Perini would never have allowed BAS to invest the company's money in ARS.  By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if BAS had not violated Tutor Perini's mandate, to wit:  an order directing BAS to remit to Tutor Perini: (a) the full par value, plus accrued interest, of the ARS in its account; (b) statutory interest at the rate of 6% from the date of Tutor Perini's ARS purchases; and (c) the costs and attorneys' fees incurred by Tutor Perini in connection with bringing this action.

## NINTH CAUSE OF ACTION
### (Breach of Contract)

95.     Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

96.     BAS was contractually limited by the terms of Tutor Perini's investment objectives, which were embodied in the Credit Agreement, to recommend only those securities that complied with Tutor Perini's objectives.

97.     Tutor Perini only authorized BAS to purchase the securities that fit its mandate, and at no time did Tutor Perini confer on BAS discretion to purchase investments that did not fit its approved profile of highly safe and liquid securities.

98.     BAS' investment of Tutor Perini's funds in ARS, which was done without knowing authorization from Tutor Perini, was a breach of contract.

99. By reason of the foregoing, Tutor Perini is entitled to be put in the position it would have occupied if BAS had not violated Tutor Perini's mandate, to wit: an order directing BAS to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

### TENTH CAUSE OF ACTION
### (Conversion)

100. Plaintiff repeats and re-alleges paragraphs 1-57 hereof with the same force and effect as if here set forth at length.

101. By reason of the foregoing, BAS has unlawfully and intentionally converted Tutor Perini's funds for its own use. Tutor Perini is entitled to be put in the position it would have occupied if BAS had not violated Tutor Perini's mandate, to wit: an order directing BAS to remit to Tutor Perini the full par value, plus accrued interest, of the ARS in its account.

WHEREFORE, Tutor Perini respectfully requests that the Court enter a judgment in its favor as follows:

1. For an order directing the defendants to provide Tutor Perini with relief equivalent to rescission of the unauthorized transactions, including but not limited to an order directing the defendants to remit to Tutor Perini the full par value, plus accrued interest, of the securities in its account.

2. For disgorgement of commissions or other compensation received by the defendants on purchases and sales of ARS for Tutor Perini's account, and the award of all such funds to Tutor Perini.

3. For the costs and attorneys' fees incurred by Tutor Perini in connection with bringing this action.

4. For an award of treble damages pursuant to M.G.L. ch. 93A.

5.      For all consequential damages, including, but not limited to, the costs Tutor Perini has incurred in replacing the liquidity lost due to the defendants' fraudulent conduct.

6.      For statutory interest at the rate of 6% from the date of Tutor Perini's ARS purchases.

7.      For an order referring the defendants to the appropriate regulatory and criminal authorities for their fraudulent conduct and subsequent cover-up.

8.      For such other and further relief as the Court may consider just and proper in the circumstances.

Plaintiff demands a trial by jury for all claims so triable.

DATED: May 18, 2011

Respectfully submitted,

By: /s/ *Matthew N. Kane*
   Peter E. Gelhaar (BBO #188310)
   Matthew N. Kane (BBO #6369801)
   Donnelly, Conroy and Gelhaar LLP
   One Beacon St., 23rd Floor
   Boston, Massachusetts  02108
   Tel: (617) 720-2880
   Facsimile: (617) 720-3554

Andrew Weissmann (*pro hac vice* forthcoming)
Katya Jestin (*pro hac vice* forthcoming)
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, New York 10022
Tel: (212) 891-1600
Facsimile: (212) 891-1699

*Attorneys for plaintiff Tutor Perini Corp.*