UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TUTOR PERINI CORP.,                )
                                   )
              Plaintiff,           )
        v.                         )        CIVIL ACTION
                                   )        NO. 11-10895-NMG
BANC OF AMERICA SECURITIES LLC,    )
now known as Merrill Lynch, Pierce, Fenner )
& Smith Incorporated, successor by merger, )
and BANK OF AMERICA, N.A.,         )
                                   )
              Defendants.          )

# MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

June 13, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Tutor Perini Corp. ("Tutor Perini"),[1] has brought this action against

Banc of America Securities LLC, now known as Merrill Lynch, Pierce, Fenner & Smith,

Incorporated ("BAS"), and BAS' affiliate, Bank of America, N.A. ("BANA").  Tutor

Perini claims that from September 2007 through February 2008, BAS, with the

knowledge and acquiescence of BANA, wrongfully invested hundreds of millions of

dollars of Tutor Perini's money in auction rate securities ("ARS"), including ARS that

---

[1]  In September 2008, Tutor Saliba Corporation merged with Perini Corporation, leaving
Perini Corporation as the surviving entity.  Thereafter, in May 2009, Perini Corporation changed
its name to Tutor Perini.  (Pl. Mem. (Docket No. 22) at 1 n.1).  For the sake of simplicity, this
court has referred to the plaintiff only by its present name, Tutor Perini.

BAS had been holding in its own inventory, without disclosing the increasing risk of illiquidity associated with such investments or the fact that BAS was attempting to eliminate ARS from its own balance sheet.

The matter is presently before the court on the "Defendants' Motion to Compel Arbitration" (Docket No. 15).  At issue is whether a 2004 Institutional Account Agreement (the "IAA Agreement), which requires the arbitration of any claims, disputes or controversies arising out of or in connection with Tutor Perini's purchase of securities "from or through" BANA, applies to the challenged transactions which were executed by BAS, but were paid for with funds automatically debited from a bank account that Tutor Perini maintained with BANA.  For all the reasons detailed herein, this court concludes that the arbitration provision of the IAA Agreement does not apply.  The Motion to Compel Arbitration (Docket No. 15) is DENIED.

## II.  <u>STATEMENT OF FACTS</u>[2]

The following facts are relevant to the defendants' motion to compel arbitration.

### <u>The Parties</u>

The plaintiff, Tutor Perini, is a building construction company which offers diversified general contracting and design and building services to private clients and

---

[2]  The facts are derived from (1) Tutor Perini's Complaint ("Compl.") (Docket No. 1); (2) the Declaration of Thomas C. Mullen ("Mullen Decl.") (Docket No. 17); (3) the Declaration of T. Peter R. Pound ("Pound Decl.") (Docket No. 18); (4) the Declaration of William Sparks ("Sparks Decl.") (Docket No.23); and (5) the Reply Declaration of T. Peter R. Pound ("Pound Rep. Decl.") (Docket No. 29).

public agencies throughout the world.  (Compl. ¶ 12).  At all relevant times, defendant

BAS was a wholly-owned subsidiary of Bank of America Corporation, and was registered

as a broker-dealer with the Securities and Exchange Commission.  (See id. ¶ 13; Pound

Decl., Ex. A at 27).  Defendant BANA also was a wholly-owned subsidiary of Bank of

America Corporation, and served as the Corporation's general commercial and retail

banking arm.  (See Compl. ¶ 14; Pound Decl., Ex. A at 93).  This case arises out of the

alleged loss of nearly $100 million in investments of ARS that BAS made for Tutor

Perini's brokerage account using funds from an account that the plaintiff maintained with

BANA.

## The Institutional Account Agreement

Tutor Perini's relationship with the defendants began in 2004, when BANA

succeeded Fleet Bank as the plaintiff's lead lending institution.  (Sparks Decl. ¶ 2).  In

November of that year, Tutor Perini entered into an Institutional Account Agreement

("IAA Agreement")[3] with BANA under which Tutor Perini authorized BANA to open a

Cash Account for it, and appointed BANA "as its agent for purposes of buying and

selling Securities and Other Property[4] in its Cash Account."  (IAA Agreement ¶ 2).  The

---

[3]  The IAA Agreement is attached as Exhibit A to the Mullen Declaration.

[4]  The IAA Agreement defines "Securities and Other Property" to include "money, instruments, certificates of deposit, bankers acceptance commodities, security entitlements and securities of every kind and nature and all contracts and actions relating thereto and all proceeds therefrom and all dividends and interest thereon, whether for present or future delivery, now or hereafter held, carried or maintained by [BANA] in or for any of Client accounts, now or hereafter opened, including any account(s) in which Client may have an interest."  (IAA Agreement ¶ 7).

IAA Agreement, and BANA's appointment as Tutor Perini's agent under that Agreement, was part of a broader relationship between the parties, which stemmed principally from BANA's status as Tutor Perini's primary lender.  (See Sparks Decl. ¶ 3).  Thus, Tutor Perini also entered into Credit Agreements with BANA, which broadly governed the scope of the plaintiff's banking relationship with BANA.[5]  (Id.).  Additionally, it maintained a number of bank accounts with BANA, including concentration, payroll, petty cash and disbursement accounts, in addition to the Cash Account established under the IAA Agreement.  (See Sparks Decl. ¶ 3 and Exs. A & B thereto at attached Schedules).  The express purpose of the IAA Agreement was to set forth the terms and conditions under which BANA would maintain Tutor Perini's Cash Account for purchases and sales of Securities and Other Property.  (IAA Agreement at p.1).  It did not purport to govern any other investment accounts maintained on behalf of Tutor Perini by BANA or any of its affiliates, such as BAS.

Pursuant to the IAA Agreement, the parties contemplated that BANA, in its capacity as Tutor Perini's agent, essentially would assume the role of a broker in executing transactions for the plaintiff's Cash Account.  For example, but without limitation, the plaintiff expressly agreed that BANA could "accept orders" from Tutor

---

[5]  Tutor Perini's Credit Agreements with BANA contained provisions under which the plaintiff agreed to submit to the nonexclusive jurisdiction of the federal and state courts of Massachusetts with respect to certain actions and proceedings relating to the Credits Agreements. (See Sparks Decl., Ex. A § 9:08 and Ex. B § 11.14(b)). However, because the plaintiff does not argue that those provisions are controlling in this case, this court will not address them further.

Perini for the execution of securities transactions "by [BANA] or others," and act upon Tutor Perini's instructions with respect to such transactions without incurring liability for doing so.  (IAA Agreement ¶ 2).  The parties also agreed that BANA would charge (and Tutor Perini would pay) commissions and other fees for executing transactions on Tutor Perini's behalf.  (Id. ¶ 5).  Moreover, the IAA Agreement, by its terms, was to cover "any and all transactions heretofore executed for [the Cash] Account by [BANA,]" and provided that BANA "may in its sole discretion decline to execute any transaction for [the plaintiff's] Account."  (Id. ¶¶ 2, 3).  However, nothing in the IAA Agreement authorized BAS, or anyone else other than BANA, to accept orders from Tutor Perini for the execution of its securities transactions.

The Agreement also was limited to securities transactions undertaken through the Cash Account authorized by the Agreement.  Thus, the Agreement imposed on Tutor Perini an obligation not to "buy any security through its Cash Account unless there are, or by Settlement Date there will be, sufficient funds delivered to [BANA] to make full cash payment," and it authorized Tutor Perini to open a separate "transaction account" with BANA or an affiliated bank in order to settle transactions made for its BANA Cash Account.  (Id. ¶ 3).  A transaction account is a BANA Demand Deposit Account, which is electronically linked to a client's brokerage account.  (Mullen Decl. ¶ 3).  It is debited when securities are purchased and credited with the proceeds when securities are sold.  (Id.).  Under the IAA Agreement, Tutor Perini agreed that in the event it elected to settle its transactions through such an account, BANA would have the right "to debit that

transaction account for payment of securities purchased and credit that transaction account with the proceeds from the sale of securities."  (IAA Agreement ¶ 3).  It also agreed "to have sufficient funds available in that transaction account on Settlement Date for all securities purchased for its [Cash] Account."  (Id.).  Notably, however, the IAA Agreement did not contemplate the use of a transaction account to settle purchases of securities for any account other than the BANA Cash Account.

There are no specific references to BAS in the IAA Agreement, and the only reference to BANA's affiliates is contained in the following clause addressing transactions with and by BANA affiliates:

> Certain Securities and Other Property purchased or sold by [Tutor Perini] through [BANA], may be purchased from or sold to an affiliate of [BANA] which may act as underwriter, broker, dealer or placement agent for such securities and assets.  [BANA] or its bank or thrift affiliates may be lenders to issuers of securities that an affiliate of [BANA] underwrites, in which case the proceeds of offerings underwritten by its affiliate may be used for repayment of such loans....

(Id. ¶ 1).  As detailed below, this court concludes that this provision simply allows BANA to engage in transactions with affiliated entities on Tutor Perini's behalf.  It did not extend the scope of the IAA Agreement to cover Tutor Perini's placement of orders with BANA affiliates such as BAS, or to cover a separate brokerage account maintained by BAS.

The IAA Agreement includes a choice of law provision requiring that "THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS

OF THE STATE OF NEW YORK (without regard to any principles of conflicts of law)

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN." (IAA Agreement

¶ 11). It also contains an arbitration clause, which provides in relevant part as follows:

> <u>Any claim, dispute, or controversy with respect to Client's Account</u>
> shall be subject to and governed by the following ARBITRATION
> AGREEMENT:
>
> Any claim, dispute, or controversy <u>arising out of or in connection
> with my purchase or sale of any municipal security from or through
> [BANA]</u> shall be submitted to arbitration under the code of
> Arbitration Procedure of the National Association of Securities
> Dealers, Inc., unless [BANA] and [Tutor Perini] agree to arbitrate
> the claim, dispute or controversy in another arbitration forum.
>
> Any claim, dispute, or controversy <u>arising out of or in connection
> with my purchase or sale of any security (other than a municipal
> security) from or through [BANA]</u> or this Agreement shall, upon the
> request of either party, be resolved by arbitration in accordance with
> the Federal Arbitration Act (Title 9 US Code). Arbitration
> proceedings shall be conducted in accordance with the rules for
> arbitration of financial services disputes of J.A.M.S. The arbitration
> shall be conducted in the City of New York or any other place as to
> which [BANA] and [Tutor Perini] mutually agree.
>
> Judgment upon any award rendered by the arbitrator(s) shall be final
> and may be entered in any court having jurisdiction ....

(<u>Id.</u> ¶ 14) (emphasis added). The fundamental question raised by the present motion is

whether these provisions apply to the claims in this action and require that the parties'

dispute be submitted to arbitration.

### BAS' Brokerage Activities on Behalf of Tutor Perini

In November 2006, two years after Tutor Perini executed the IAA Agreement,

Tutor Perini began trading securities through BANA's affiliate, defendant BAS. (Mullen

Decl. ¶ 4).[6]  It is undisputed that the securities transactions carried out by BAS on Tutor Perini's behalf were made for the plaintiff's brokerage account at BAS, and that the ARS transactions described in Tutor Perini's complaint were purchased for its BAS brokerage account.  (See id. ¶¶ 2, 4, 6; Sparks Decl. ¶ 5).  They were not executed by BANA, and were not made for Tutor Perini's Cash Account at BANA.

Typically, in order to carry out a securities transaction at BAS, the customer would first instruct an account representative at BAS to purchase a security.  (Mullen Decl. ¶ 5).  Subsequently, the transaction would be confirmed by a trader, and then funds would be delivered to the counterparty to pay for the security.  (Id.).  Because Tutor Perini elected to electronically link its BANA transaction account to its BAS brokerage account, the funds needed to pay for its securities purchases would automatically be transferred from Tutor Perini's transaction account to its brokerage account.  (See id. ¶ 4).  Once the security was purchased, it would be delivered to the customer to settle the transaction. (See id.).

This was the procedure that was used to complete the ARS purchases for Tutor Perini's brokerage account during the time period from September 2007 through February 2008.  Thus, each time the plaintiff instructed its BAS account representative to purchase

---

[6]  At oral argument, BANA asserted that Tutor Perini claims to have started trading through BAS at the time it entered into the IAA Agreement.  However, BANA is misreading the plaintiff's statement of facts, which does not specify when BAS began executing trades on its behalf.  In any event, BANA has provided specific and persuasive testimony concerning the date Tutor Perini started trading through BAS.

ARS on its behalf, the purchase order was confirmed by a trader and then BAS'

electronic system automatically transferred cash from Tutor Perini's BANA transaction

account to its BAS brokerage account with a corresponding debit to the transaction

account.  (Id. ¶ 6).  The transactions were completed after the purchases were executed

and the securities were delivered to Tutor Perini's BAS brokerage account.  (Id.).  The

transaction never went through the Cash Account created by the IAA Agreement, and

BANA never acted as the broker.

### Tutor Perini's Brokerage Agreements

Despite the fact that BAS has been acting as Tutor Perini's broker for several

years, it apparently was not until June 23, 2008 that Tutor Perini executed an Account

Application Form and Agreement (the "2008 Brokerage Agreement") relating to its

purchases and sales of securities for its BAS brokerage account.  (See Sparks Decl. ¶ 6;

2008 Brokerage Agreement).[7]  Therein, Tutor Perini identified its transaction account at

BANA as the account to be debited and credited in connection with securities transac-

tions made through its BAS brokerage account, and it authorized BANA to accept

instructions from BAS to debit the transaction account in order to settle purchases made

for its BAS brokerage account.  (Id.).  The Brokerage Agreement makes it clear that

BANA and BAS are separate entities and that they have separate roles.  Thus BAS is to

purchase or sell securities (id. ¶¶ 2, 3) while BANA's involvement was limited to

---

[7]  The 2008 Brokerage Agreement is attached as Exhibit C to the Sparks Declaration.

accepting instructions from BAS to debit the transaction account, if appropriate.  (<u>Id.</u> ¶ 4).

The 2008 Brokerage Agreement contains no references to arbitration.  Rather, pursuant to

that Agreement, Tutor Perini agreed that

> [i]n respect of any suit, action, or proceeding brought to enforce [its]
> obligations under this Agreement or in any way relating to this
> Agreement or in respect of any disputes that arise concerning [its]
> accounts, [Tutor Perini] agree[s] (a) that the laws of the State of New
> York shall apply, (without regard to conflict of law principles), and
> (b) to irrevocably and unconditionally (i) submit to the exclusive
> jurisdiction of any United States Federal or New State court sitting
> in the Borough of Manhattan, City of New York, and any appellate
> court from such court, and (ii) waive any defense of inconvenient
> forum to the maintenance of any suit, action, or proceeding in any
> such court and any right of jurisdiction on account of [Tutor
> Perini's] place of residence or domicile....

(<u>Id.</u> ¶ 7).

On December 8, 2009, the plaintiff executed a second Account Application Form

and Agreement (the "2009 Brokerage Agreement").[8]  (Sparks Decl. ¶ 7).  The 2009

Brokerage Agreement is nearly identical to the 2008 Brokerage Agreement, except that it

expressly excludes from certain of its provisions, including the forum selection provision,

"any and all claims related to and/or arising out of the sale by us to you of auction rate

securities prior to the date of this Agreement[,]" and provides that the parties intended to

leave such claims "unaffected by this Agreement."  (<u>Id.</u> ¶ 8; 2009 Brokerage Agreement

¶¶ 5, 7).  Tutor Perini asserts that the Brokerage Agreements governed its earlier ARS

---

[8]  Tutor Perini executed the 2009 Brokerage Agreement following the merger of Perini
Corporation into Tutor Saliba, and after Perini Corporation had changed its name to Tutor Perini.
(<u>See</u> note 1 <u>supra</u>).  That Agreement is attached as Exhibit D to the Sparks Declaration.

transactions, and that the exclusion of ARS claims from the forum selection provision of the 2009 Brokerage Agreement left its free to choose a forum in which to litigate those claims.  (Pl. Opp. Mem. at 9).

## Tutor Perini's Claims in the Present Litigation

Tutor Perini brought this action against BAS and BANA on May 18, 2011.  The gravamen of its complaint is that during the time period from September 2007 through February 2008, BAS, with the knowledge and acquiescence of BANA, wrongfully invested hundreds of millions of dollars of Tutor Perini's money in ARS, including ARS that BAS had been holding in its own inventory, without disclosing the increasing risk of illiquidity associated with such investments or the fact that BAS was attempting to eliminate ARS from its own balance sheet.  (See Compl. ¶¶ 1-4, 28, 56).  In particular, Tutor Perini alleges that BAS, in its capacity as the plaintiff's investment advisor and broker, made misrepresentations to the plaintiff  about the safety and liquidity of ARS, as well as the appropriateness of ARS as an investment alternative for Tutor Perini's cash holdings, despite BAS' knowledge that the ARS market was experiencing unprecedented upheaval and was facing an increasing risk of collapse.  (See id. ¶¶ 2, 29-33).  It further alleges that BANA was aware of the risks associated with ARS during the relevant time period, and even prepared a written disclosure for its own clients to warn them of the increasing risks of ARS, but that it failed to alert Tutor Perini to those risks or to share the disclosure with the plaintiff.  (Id. ¶¶ 3, 4, 51).  Accordingly, Tutor Perini claims that BANA, in its capacity as the plaintiff's long-term lead lender, and BAS, in its capacity as

the plaintiff's ARS dealer, acted in unison and conspired to keep Tutor Perini from learning the truth about the investments that BAS was making on its behalf.  (Id. ¶¶ 53-55).

The plaintiff claims that the defendants' conduct was motivated by the desire to move risky ARS off of BAS' own balance sheet, and by BAS' own economic interests, as an underwriter, auction dealer, lead manager, trustee and auction agent on numerous ARS issues, in preventing the collapse of the ARS market and continuing to earn substantial fees on the investment side of the ARS business.  (Id. ¶¶ 7, 25, 26, 35, 38-42).  However, by February 2008, BAS allegedly could no longer maintain its support for the ARS market, and the market for the ARS held by Tutor Perini failed.  (Id. ¶¶ 9, 56).  The plaintiff contends that it now holds nearly $100 million in frozen ARS in its BAS brokerage account as a result of the defendants' actions.  (Id. ¶¶ 9, 57).

By its complaint, Tutor Perini has asserted ten causes of action arising out of the purchases of ARS that BAS made for its brokerage account, including claims for securities fraud (Counts I & VIII); common law fraud (Counts II-III); negligent misrepresentation (Count IV); violations of Mass. Gen. Laws ch. 93A (Count V); civil conspiracy (Counts VI-VII); breach of contract (Count IX); and conversion (Count X). Pursuant to these claims, Tutor Perini is seeking, among other things, "relief equivalent to rescission of the unauthorized transactions, including but not limited to an order directing the defendants to remit to Tutor Perini the full par value, plus accrued interest, of the securities in its [BAS brokerage] account."  (Compl. at p. 26).

## <u>Defendants' Effort to Transfer the Matter to California</u>

On June 7, 2011, shortly after this litigation was filed, the defendants filed a Notice of Tag-Along Action with the Judicial Panel on Multidistrict Litigation ("JPML") in which they asserted that this action is related to multidistrict litigation pending in the Northern District of California.  (<u>See</u> Docket No. 12).  One day later, on June 8, 2011, the JPML issued a Conditional Transfer Order to transfer the matter to California.  (<u>See</u> <u>id.</u>).  However, Tutor Perini opposed the transfer, and the JPML ultimately vacated its Order.  (<u>See</u> Docket No. 13).

On August 10, 2011, while the JPML's decision on transfer was still pending, the parties filed a Stipulation and Proposed Order with the court in which they agreed to postpone the filing of any motion to compel arbitration until after the JPML had determined the appropriate venue for pretrial proceedings.  (Docket No. 10).  The Stipulation was adopted as an order of the court on August 11, 2011.  (Docket No. 12).  Nevertheless, Tutor Perini contends that the defendants waived any right to arbitrate the claims in this matter by seeking a transfer to the court in California.

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  <u>ANALYSIS</u>

The defendants have moved to compel arbitration based on the arbitration provisions of the IAA Agreement.  Specifically, they contend that Tutor Perini's claims in this action are arbitrable under that Agreement because they arise out of Tutor Perini's

purchases of securities "from or through" BANA.  They also contend that BAS may

enforce the arbitration provisions contained in the IAA Agreement, even though it was

not a signatory to the Agreement, because the language of those provisions is sufficiently

expansive to include Tutor Perini's claims against both BANA and BAS, and because the

claims against BAS are intertwined with the IAA Agreement.  Thus, the defendants assert

that all of the plaintiff's claims in this action must be submitted to arbitration in

accordance with the IAA Agreement.

The plaintiff disputes that the IAA Agreement requires arbitration of its claims or

even applies to the present dispute.  Rather, the plaintiff argues that the ARS purchases

that were made for its brokerage account were governed by the 2008 and 2009 Brokerage

Agreements, and that under the most recent Agreement, Tutor Perini is free to select a

judicial forum for purposes of litigating its ARS claims.  It further argues that even if

some or all of its claims were to fall within the scope of the arbitration agreement, the

defendants have waived any right to arbitrate by seeking to have this case transferred to

the Northern District of California.

The threshold issue raised by the defendants' motion is whether there was an

agreement to arbitrate Tutor Perini's ARS claims.  For the reasons that follow, this court

concludes that the arbitration provisions of the IAA Agreement do not apply because the

plaintiff's claims do not arise out of a purchase of securities "from or through" BANA.

Therefore, the defendants' motion to compel is denied and it is not necessary to address

the parties' remaining arguments.

A.      **Standard of Review**

Section 3 of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), provides

as follows:

> If any suit or proceeding be brought in any of the courts of the
> United States upon any issue referable to arbitration under an
> agreement in writing for such arbitration, the court in which suit is
> pending, upon being satisfied that the issue involved in such suit or
> proceeding is referable to arbitration under such an agreement, shall
> on application of one of the parties stay the trial of the action until
> such arbitration has been had in accordance with the terms of the
> agreement, providing the applicant for the stay is not in default in
> proceeding with such arbitration.

9 U.S.C. § 3.  Therefore, the staying of an action is mandatory "where that action

involves issues intended by the parties to be resolved through arbitration[.]"  Bowlby v.

Carter Mfg. Corp., 138 F. Supp. 2d 182, 186 (D. Mass. 2001).

The FAA reflects "a strong federal policy favoring arbitration[.]"  Id. at 187.

Where the parties have entered into a contract containing an arbitration clause, "there is a

presumption of arbitrability in the sense that '[a]n order to arbitrate the particular

grievance should not be denied unless it may be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

Doubts should be resolved in favor of coverage.'"  AT & T Tech., Inc. v. Communica-

tions Workers of Am., 475 U.S. 643, 650, 106 S. Ct. 1415, 1419, 89 L. Ed. 2d 648 (1986)

(quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83,

80 S. Ct. 1347, 1352-53, 4 L. Ed. 2d 1409 (1960)).  On the other hand, "'arbitration is a

matter of contract and a party cannot be required to submit to arbitration a dispute which

he has not agreed so to submit.'"  Id. at 648, 106 S. Ct. at 1418 (quoting Warrior & Gulf

Navigation Co., 363 U.S. at 582, 80 S. Ct. at 1353).  "'Thus, a party seeking to substitute

an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists

have agreed to arbitrate *some* claims.'"  Bowlby, 138 F. Supp. 2d at 187 (quoting

McCarthy v. Azure, 22 F.3d 351, 354-55 (1st Cir. 1994)).

 "When deciding a motion to compel arbitration, a court must determine whether

'(i) there exists a written agreement to arbitrate, (ii) the dispute falls within the scope of

that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its

right to arbitration.'"  Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008)

(quoting Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co., 62 F. Supp. 2d 152,

155 (D. Me. 1999)).  "Only if all three prongs of the test are satisfied will a motion to

compel arbitration be granted."  Id.  In the instant case, there is no dispute that the IAA

Agreement contains a written agreement to arbitrate.  However, this court finds that

arbitration is not warranted here because the parties' dispute does not fall within the

scope of that agreement.

 **B. Arbitrability of Tutor Perini's Claims Under the IAA Agreement**

 "'When deciding whether the parties agreed to arbitrate a certain matter, courts

generally should apply ordinary state-law principles that govern the formation of

contracts.'"  Combined Energies, 514 F.3d at 171 (quoting First Options of Chicago, Inc.

v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)) (alteration and

punctuation omitted).  In the instant case, the IAA Agreement contains a choice of law

provision selecting New York law as the governing law.  (See Mullen Decl., Ex. A ¶ 11).

When interpreting a written contract under New York law, "[w]ords and phrases used by

the parties must be given their plain meaning."  DDS Partners v. Celenza, 6 A.D. 3d 347,

348, 775 N.Y.S.2d 319 (2004) (internal citation omitted).  Furthermore,

> the court should give effect to the intent of the parties as revealed by
> the language and structure of the contract, and should ascertain such
> intent by examining the document as a whole.  Effect and meaning
> must be given to every term of the contract, and reasonable effort
> must be made to harmonize all of its terms.  Moreover, the contract
> must be interpreted so as to give effect to, not nullify, its general or
> primary purpose.

Reda v. Eastman Kodak Co., 233 A.D. 2d 914, 914-15, 649 N.Y.S.2d 555 (1996).[9]

The relevant portion of the IAA Agreement requires the submission to arbitration

of "[a]ny claim, dispute, or controversy arising out of or in connection with [Tutor

Perini's] purchase or sale of any security . . . from or through" BANA.  (Mullen Decl.,

Ex. A ¶ 14).  In support of their argument that arbitration is warranted, the defendants

contend that Tutor Perini's claims against BANA arose "out of or in connection with" the

purchase of securities because the plaintiff alleges that BANA's misrepresentations and

omissions induced it to buy ARS.  (Def. Mem. at 8-9).  They further assert that those

purchases occurred "through" BANA "because cash payment for each transaction

occurred with funds from [Tutor] Perini's designated BANA transaction account."  (Id.).

---

[9]  To the extent Massachusetts law were to apply, the basic principles of contract interpre-
tation would be the same as under New York law.  See, e.g., Sarvis v. Cooper, 40 Mass. App. Ct.
471, 475-76, 665 N.E.2d 119, 122 (1996).

Although the record demonstrates that the plaintiff's claims arose out of purchases of securities, this court finds that those purchases did not occur "through" BANA nor were they for the Cash Account established by the IAA Agreement.  In short, the IAA Agreement does not control.

As detailed above, it is undisputed that the ARS transactions were executed by BAS pursuant to purchase orders that Tutor Perini directed to its account representative at BAS.  (See Mullen Decl. ¶ 6).  It is also undisputed that those purchases were made for Tutor Perini's brokerage account at BAS.  (See id.).  There is no indication that anyone at BANA accepted orders for ARS from Tutor Perini or was instrumental in purchasing those securities and delivering them to the plaintiff's brokerage account.  Thus, although funds to pay for the securities was automatically transferred from Tutor Perini's BANA transaction account to its brokerage account, the actual purchases were made "through" BAS rather than BANA.  See Merriam-Webster's Online Dictionary, http://www.merriamwebster.com/dictionary/through (defining "through" as a "function word to indicate movement into at one side or point and out at another" or to mean "by way of").

The defendants' argument that the purchases were made through BANA simply because the funds came from a bank account at BANA is inconsistent with the plain language of the IAA Agreement.  That Agreement, which was executed two years before BAS began trading securities on Tutor Perini's behalf, does not purport to govern transactions by BAS for the plaintiff's BAS brokerage account.  As detailed above, the

-18-

IAA Agreement does not contain any references to a separate brokerage account at BAS, and does not authorize anyone other than BANA to accept orders for purchases of securities on behalf of Tutor Perini.  Instead, by its express language, the Agreement appoints BANA as the plaintiff's agent for the purposes of buying and selling securities in the plaintiff's Cash Account, and authorizes BANA, not BAS, to accept orders from Tutor Perini for the execution of such transactions "by [BANA] or others."  (IAA Agreement ¶ 2).  Moreover, the Agreement expressly provides that it covers "any and all transactions heretofore executed for [Tutor Perini's Cash] Account by [BANA.]"  (Id.).  Accordingly, the parties to the Agreement contemplated that purchases of securities "through" BANA would be made for Tutor Perini's BANA Cash Account pursuant to purchase orders directed to and carried out by BANA.  They did not express any intent to have the Agreement govern securities transactions made by BAS for the plaintiff's BAS brokerage account.

The language used in the arbitration provisions confirms this conclusion. Under the heading "ARBITRATION AGREEMENT," the IAA Agreement reads that "[a]ny claim, dispute, or controversy with respect to Client's Account shall be subject to and governed by the following ARBITRATION AGREEMENT[.]"  (IAA Agreement ¶ 4) (emphasis added).  The capitalized term "Account" is used throughout the IAA Agreement to refer to the BANA Cash Account.[10]  Accordingly, the arbitration provisions were

---

[10]  For example, pursuant to paragraph 2 of the IAA Agreement, BANA was authorized to "open a Cash Account" for the client.  Throughout paragraph 3, entitled "Orders, Deliveries

not meant to cover claims, such as those asserted in this action, respecting the BAS brokerage account.

The defendants argue that the plaintiff's decision to name BANA as a defendant in this action, and to seek recision from BANA, constitutes an implicit admission that Tutor Perini purchased ARS "from or through" BANA. (Def. Mem. at 9). The record before this court suggests no such admission. Rather, as alleged in its complaint, Tutor Perini is claiming that BANA betrayed the position of trust it had assumed as the plaintiff's lead lending institution by failing to disclose its knowledge about the risks of ARS that were purchased by its affiliate for the plaintiff's brokerage account. (<u>See</u>, <u>e.g.</u>, Compl. ¶¶ 17, 29, 35, 51-55). Accordingly, it was in its capacity as Tutor Perini's lender that BANA allegedly conspired with BAS to hide the truth about the investments from its long-standing client, Tutor Perini. (<u>See id.</u> ¶¶ 53-55). It is clear from the complaint that BAS was the entity responsible for carrying out the alleged ARS purchases. (<u>See</u>, <u>e.g.</u>, Compl. ¶¶ 1, 3, 54).

The defendants also contend that Tutor Perini's use of the BAS brokerage account in connection with the disputed transactions "only means that the ARS were purchased 'through' *both* BANA and BAS[,]" and they argue that the language of the IAA Agreement supports this interpretation by, in paragraph 2, "(i) appointing BANA as Perini's

and Settlements," references to the "Account" are either expressly or implicitly to the "Cash Account." In the same paragraph, however, all other accounts, such as the "transaction account" or the "safekeeping account," use a lower case for the word "account."

'*agent* for the purposes of buying and selling Securities and Other Property,'" and in paragraph 1, "(ii) disclosing that certain securities, 'purchased or sold by [Perini] *through* [BANA], may be purchased from . . . an affiliate of [BANA] which may act as under-writer, *broker, dealer*, or placement agent for such securities and assets.'" (Def. Mem. at 10 (quoting IAA Agreement ¶¶ 2, 1)). Again this court disagrees.

As described above, the IAA Agreement specifies that Tutor Perini appointed BANA as its agent "for the purposes of buying and selling Securities and Other Property in its <u>Cash Account</u>." (IAA Agreement ¶ 2) (emphasis added). Nothing in the Agreement authorized BANA to act as an agent for purposes of buying and selling securities in a separate brokerage account maintained BAS. Moreover, nothing in the Agreement authorized BAS to act as Tutor Perini's agent for the purpose of executing securities transactions. However, it was BAS which accepted and executed orders from the plaintiff for the purchase of the ARS securities at issue in this case.

The defendants' reliance on the above quoted language from paragraph 1 of the IAA Agreement, entitled "transactions with and by affiliates," is similarly misplaced. As an initial matter, paragraph 1 addresses only securities "purchased or sold by Client through [BANA]" and discloses that BANA may purchase or sell securities from a BANA affiliate. There is nothing in this provision which covers the situation where the Client does not go "through" BANA, but rather enters into transactions directly with an

affiliated company.[11]  Moreover, there is nothing in paragraph 1 of the IAA Agreement which modifies the unambiguous language of paragraph 2, entitled "authorization to open cash account," pursuant to which "Client requests that [BANA] open a Cash Account for it" and "appoints [BANA] as its agent for the purposes of buying and selling Securities and Other Property in its Cash Account."  Again, there is nothing that authorizes any affiliate to act as Tutor Perini's agent.  In short, the provision entitled "transactions with and by affiliates" was clearly intended simply to notify the client that BANA may engage in transactions with affiliates for the BANA Cash Account.[12]  It did not extend the coverage of the IAA Agreement to other accounts with other entities.[13]

Finally, the fact that the IAA Agreement authorized Tutor Perini, at its election, to "settle all transactions through its designated transaction account" does not suggest that the claims in this action arise out of securities purchases that were made "through" BANA.  (IAA Agreement ¶ 3).  As demonstrated by the discussion of the transaction account contained in the IAA Agreement, money in the transaction account could, at

---

[11]  This is consistent with the structure of the entire IAA Agreement.  For example, pursuant to paragraph 2, Tutor Perini acknowledged that BANA "may accept orders from Client for execution by [BANA] or others."  However, all orders needed to go through BANA to be covered by the Agreement.

[12]  This is not an uncommon provision in the context of a fiduciary relationship.  See, e.g., Mass. Gen. Laws ch. 167G § 3 at ¶ 11.

[13]  In light of this court's conclusion that the IAA Agreement does not apply, this court does not need to reach the argument whether the 2008 and 2009 Brokerage Agreements govern the earlier ARS purchases.  It is interesting to note, however, that to the extent that BAS (as opposed to BANA) indicated a preference as to a dispute resolution forum, it did not ask for arbitration.  The arbitration clause is only found in BANA's Agreement.

Tutor Perini's option, be used to pay for purchases made by BANA for Tutor Perini's Cash Account.  (See id. ("If Client elects to settle all transactions through its designated transaction account," "Client agrees to have sufficient funds available in that transaction account on Settlement Date for all securities purchased for its [Cash] Account.")).  The existence of the transaction account did not broaden the scope of the IAA Agreement.  Additionally, the provisions authorizing the use of a transaction account merely provided that funds would be debited from a bank account in order to pay for purchases made for an investment account.  (See id. ("Client agrees that on Settlement Date, [BANA] may debit that transaction account for payment of securities purchased")).  However, Tutor Perini's claims in this action challenge actual purchases of securities and alleged misstatements and omissions made in connection with those purchases.  They do not concern whether BANA properly debited the plaintiff's transaction account.  Therefore, the references to the BANA transaction account do not support arbitration.

As described above, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Tech., Inc., 475 U.S. at 648, 106 S. Ct. at 1418 (quoting Warrior & Gulf Navigation Co., 363 U.S. at 582, 80 S. Ct. at 1353).  Because Tutor Perini did not agree to submit to arbitration claims arising out of ARS purchases made by BAS for its BAS brokerage account, the defendants' motion to compel arbitration must be denied.[14]

---

[14]  In light of this court's conclusion that the IAA Agreement does not require arbitration of Tutor Perini's ARS claims, it is not necessary to address the defendants' argument that the

## IV.  **CONCLUSION**

For all the reasons detailed herein, the "Defendants' Motion to Compel

Arbitration" (Docket No. 15) is DENIED.


      / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

arbitration provisions cover claims against BAS, as an affiliated entity of BANA, or the plaintiff's arguments either that the defendants waived arbitration by seeking to transfer this case to California, or that its relationship with BAS is governed by the 2008 and 2009 Brokerage Agreements.