UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| TUTOR PERINI CORP., | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | CIVIL ACTION | |
| | ) | NO. 11-10895-NMG | |
| BANC OF AMERICA SECURITIES LLC, | ) | | |
| now known as Merrill Lynch, Pierce, Fenner | ) | | |
| & Smith Incorporated, successor by merger, | ) | | |
| and BANK OF AMERICA, N.A., | ) | | |
| | ) | | |
| Defendants. | ) | | |

REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION TO DISMISS

July 17, 2013

DEIN, U.S.M.J.

## I. INTRODUCTION

This action, like many similar actions that have been filed throughout the country, was triggered by the collapse of the auction rate securities ("ARS") market in February 2008. In this case, the plaintiff, Tutor Perini Corp. ("Tutor Perini"),[1] has brought claims against its broker and investment advisor, Banc of America Securities LLC, now known as Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("BAS"), and BAS's affiliate, Bank of America, N.A. ("BANA"). Tutor Perini alleges that during the time period from

---

[1] In September 2008, Tutor Saliba Corporation merged with Perini Corporation, leaving Perini Corporation as the surviving entity. Thereafter, in May 2009, Perini Corporation changed its name to Tutor Perini. (Docket No. 30 at 1 n.1). For the sake of simplicity, this court has referred to the plaintiff only by its present name, Tutor Perini.

September 2007 through February 2008, BAS, with the knowledge and acquiescence of BANA, invested hundreds of millions of dollars of Tutor Perini's money in toxic ARS, including ARS that BAS had been holding in its own inventory, without disclosing the increasingly severe risk of illiquidity associated with such investments or the fact that BAS was engaged in a strategy to reduce its own inventory of ARS by foisting them onto its clients. Tutor Perini claims that the very risks which the defendants concealed from it materialized in February 2008, when the ARS market collapsed and ARS investors such as the plaintiff were unable to liquidate their holdings. Tutor Perini contends that as a result of the defendants' conduct, it continues to hold nearly $100 million worth of ARS, which remain frozen in its account at BAS and will not mature for decades.

By its Complaint, Tutor Perini asserts that the defendants committed securities fraud, in violation of section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, by making material misrepresentations and omissions regarding the risks of investing in ARS, and by selling it securities that were unsuitable in light of Tutor Perini's investment objectives (Count I). In addition, Tutor Perini asserts nine separate state law claims against the defendants, which include claims for intentional misrepresentation (Count II), fraudulent concealment (Count III), negligent misrepresentation (Count IV), violation of Mass. Gen. Laws ch. 93A (Count V), civil conspiracy (Counts VI-VII), violation of Mass. Gen. Laws ch. 110A, § 410(a)(2) (Count VIII), breach of contract (Count IX), and conversion (Count X).

2

The matter is presently before the court on the "Defendants' Motion to Dismiss" (Docket No. 36).  By their motion, the defendants contend that Tutor Perini's Exchange Act claims must be dismissed because the plaintiff has failed to comply with the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4(b), and has otherwise failed to allege facts sufficient to plead the elements of its claims.  Similarly, they contend that each of Tutor Perini's state law claims must be dismissed because the allegations supporting them are inadequate to comply with the pleading requirements of either Fed. R. Civ. P. 9(b) or Fed. R. Civ. P. 8, and because Counts V and IX fail as a matter of law.  As detailed herein, this court finds that Tutor Perini has failed to state claims for civil conspiracy, breach of contract and conversion, but that its remaining claims are sufficient to comply with the applicable pleading standards and to state a claim for relief.  Accordingly, and for all the reasons described below, this court recommends to the District Judge to whom this case is assigned that the defendants' motion to dismiss be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that Counts VI, VII, IX and X be dismissed, but that the motion otherwise be denied.

## II.  <u>STANDARD OF REVIEW OF RECORD</u>

### A.  <u>Motion to Dismiss Standard of Review</u>

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." <u>Aronson v. Advanced Cell Tech., Inc.</u>, 902 F. Supp. 2d 106, 112 (D. Mass. 2012)

(quoting <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993)).  The court may grant

dismissal only if the plaintiff has failed to allege "a plausible entitlement to relief."  <u>Bell</u>

<u>Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929

(2007).  Accordingly, "the complaint must include 'factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

<u>SEC v. Tambone</u>, 597 F.3d 436, 442 (1st Cir. 2010) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S.

662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).  "If the factual allegations in

the complaint are too meager, vague, or conclusory to remove the possibility of relief

from the realm of mere conjecture, the complaint is open to dismissal."  <u>Id.</u>

### B.  <u>PSLRA Heightened Pleading Requirements</u>

In 1995, Congress enacted the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4, which marked an effort to curb abuse in private securities

lawsuits.  <u>See</u> <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 191 (1st Cir. 1999).  The

PSLRA established strict pleading standards for such lawsuits, which are consistent with

the First Circuit's preexisting standards for pleading securities fraud under Fed. R. Civ. P.

9(b).  <u>See</u> <u>id.</u> at 193.  The statute requires that a complaint claiming securities fraud based

on misleading statements or omissions "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-

4(b)(1).  Additionally, where a plaintiff's cause of action requires proof that a defendant

4

acted with a particular state of mind, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "The 'required state of mind' for liability under section 10(b) [of the Exchange Act] and Rule 10b-5 is referred to as scienter, which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'"  Greebel, 194 F.3d at 194 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976)).

Although the pleading requirements in private securities fraud cases are strict, "they do not change the standard of review for a motion to dismiss."  Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002).  Accordingly, the facts alleged in the complaint must be viewed in the light most favorable to the plaintiff.

### III.  **STATEMENT OF FACTS**

#### **Scope of the Record**

In connection with their motion to dismiss, the defendants have submitted

numerous documents that were not attached to Tutor Perini's complaint.  The documents

include an order issued by the Securities and Exhange Commission in an administrative

proceeding involving BAS; information from Bank of America's website regarding

BAS's ARS-related practices and procedures; news articles concerning the ARS market;

ARS offering memoranda; historical interest rate indices; an Amended and Restated

Credit Agreement among the plaintiff, certain of its subsidiaries and BANA; email

communications from BAS to Tutor Perini containing information regarding ARS;

account statements from Tutor Perini's BAS and BANA accounts; and publicly available

pleadings and briefs that were filed in connection with proceedings in other courts.  The

defendants assert that the court may consider these materials without converting the mo-

tion into one for summary judgment.  (Def. Mem. (Docket No. 37) at 4 n.2).  However,

the plaintiff argues that the materials are not properly before the court on a motion to

dismiss, and it urges the court to disregard them or deny the motion and permit discovery

on matters that are subject to factual dispute.  (Pl. Opp. Mem. (Docket No. 43) at 9 n.6).

Ordinarily, on a motion to dismiss, "a court may not consider any documents that

are outside of the complaint, or not expressly incorporated therein, unless the motion is

converted into one for summary judgment."  Alt. Energy, Inc. v. St. Paul Fire & Marine

Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  However, the First Circuit recognizes "a

narrow exception" to this rule which allows courts considering a motion to dismiss to review "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiff['s] claim; [and] . . . documents sufficiently referred to in the complaint." Id. (quoting Watterson, 987 F.2d at 3). Nevertheless, the decision whether to consider or exclude such material rests with the trial court's discretion. See Schaffer v. Timberland Co., 924 F. Supp. 1298, 1305-06 (D.N.H. 1996) (refusing, "in the exercise of its discretion," to consider extraneous materials, including analysts' reports, articles from trade publications, press releases and internal company memoranda, in ruling on defendant's motion to dismiss). This court concludes that with the exception of the Amended and Restated Credit Agreement ("Credit Agreement"), the extraneous materials submitted by the defendants should be excluded.

This court finds that it is appropriate to consider the Credit Agreement, which has been submitted as Exhibit Q to the Declaration of T. Peter R. Pound in Support of Defendants' Motion to Dismiss (Docket No. 38). In support of its claim for breach of contract, the plaintiff alleges that "BAS was contractually limited by the terms of Tutor Perini's investment objectives, which were embodied in the Credit Agreement, to recommend only those securities that complied with Tutor Perini's objectives." (Complaint ("Compl.") (Docket No. 1) ¶ 96). Where, as here, "a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document mergers into the pleadings and the trial court can

review it in deciding a motion to dismiss under Rule 12(b)(6)." Bagg v. Highbeam

Research, Inc., 862 F. Supp. 2d 41, 44 (D. Mass. 2012) (quoting Beddall v. State St. Bank

& Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)).  Because the plaintiff's contract claim is

"dependent upon the [Credit] Agreement, or in any event inextricably entwined with it[,]"

this court will review it in connection with its analysis of the motion to dismiss.  Id.

The remaining exhibits submitted by the defendants are not expressly referenced

in or otherwise incorporated into the complaint.  Moreover, to the extent they arguably

fall within one of the exceptions to the ordinary rule that the court may not consider

documents outside the complaint on a motion to dismiss, this court finds that they are not

particularly relevant to the matters at issue[2] or that they raise numerous factual issues

which cannot be resolved at this stage in the litigation.[3]  Finally, while the proposed

---

[2]  For example, in connection with its Reply Memorandum, the defendants submitted
various pleadings and memoranda from other ARS-related cases in order to show that other
courts have rejected the same types of arguments and allegations that Tutor Perini is asserting in
this case.  (See Def. Reply Mem. (Docket No. 50) at App. C-E; Reply Declaration of T. Peter R.
Pound (Docket No. 51) at Exs. R-X).  However, this court is capable of reviewing the relevant
case law and applying it to the allegations of the plaintiff's complaint without having to consider
pleadings and briefs that have been filed in other cases and in other jurisdictions.  Thus, although
"federal courts may take judicial notice of proceedings in other courts if those proceedings have
relevance to the matters at hand[,]" the pleadings and memoranda submitted by the defendants in
this case provide little value and are not necessary to resolve the pending motion to dismiss.  See
Rodi v. S. New England Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004) (quoting Kowalski v. Gagne,
914 F.2d 299, 305 (1st Cir. 1990)).

[3]  For instance, but without limitation, in order to rebut Tutor Perini's claim that it was
misled by BAS's misrepresentations and omissions, the defendants have submitted documents
showing that Tutor Perini received and/or had access to multiple disclosures regarding the risks
and characteristics of ARS.  (See Def. Mem. at 6-8, 19-20 (citing extraneous materials)).  This
court finds that this evidence raises questions of fact as to what Tutor Perini knew and when, as

exhibits are substantial, they do not purport to include all communications between the parties. Rather, as Tutor Perini asserts, the defendants are "cobbling together a smattering of documents and alleged facts in order to present a narrative contrary to that set forth in the Complaint." (Pl. Opp. Mem. at 1). Accordingly, this court concludes that consideration of the extraneous materials at this stage "would bypass the Rule 12 scrutiny of the pleadings and, instead, would accelerate this litigation to the broader evidentiary inquiry reserved for summary judgment or, in the event of a factual dispute, trial on the merits." Schaffer, 924 F. Supp. at 1306. See also Akamai Techs., Inc. v. Deutsche Bank AG, 764 F. Supp. 2d 263, 264 n.2 (D. Mass. 2011) (declining to consider matters outside the complaint in connection with broker's motion to dismiss securities law claims arising from investments in ARS). Thus, with the exception of the Credit Agreement, the following facts and analysis are based solely on the allegations set forth in Tutor Perini's complaint.

### The Parties

The plaintiff, Tutor Perini, is a leading building construction company, which is incorporated in Massachusetts and is headquartered in Sylmar, California. (Compl. ¶ 12). In connection with its business, Tutor Perini offers general contracting, as well as design

---

well as disputes regarding the extent to which the disclosures actually revealed the information which was allegedly withheld from the plaintiff. (See Pl. Opp. Mem. at 9-10 (arguing that the defendants' disclosures were insufficient to warn Tutor Perini about the risks of ARS or to contradict the plaintiff's allegations of material omissions)). Such issues should be resolved following discovery and not on a motion to dismiss.

and building services, to private clients and public entities throughout the world.  (Id.).

Defendant BANA is a bank which is registered in Delaware, has a principal place of business in North Carolina, and is a wholly-owned subsidiary of Bank of America Corporation, a major global banking institution.  (Id. ¶ 14).  BANA has had a long business relationship with Tutor Perini during which it acted as the lead bank in Tutor Perini's lending group.  (See id. ¶¶ 15, 17).

Defendant BAS was at all relevant times an investment banking company which was registered in Delaware, had a principal place of business in New York, and was registered as a broker-dealer with the SEC.  (Id. ¶ 13).  Like BANA, BAS was a wholly-owned subsidiary of Bank of America Corporation, and had a long business relationship with Tutor Perini during which its served as Tutor Perini's broker and investment advisor. (Id. ¶¶ 13, 15).

## **Auction Rate Securities**

As described above, this case arises out of BAS's investments, on behalf of Tutor Perini, in a type of security known as ARS.  ARS are a form of bond that have long maturity periods of up to 30 or 40 years.  (Id. ¶ 18).  However, because ARS pay interest at rates that are reset at regular intervals – typically 7, 28 or 35 days – they enable issuers to access long-term financing at short-term rates.  (Id.).

The interest rates for ARS are set during what is known as a "Dutch" auction. (Id.).  During the Dutch auction, prospective purchasers of ARS submit bids to an auction agent.  (Id. ¶ 19).  Each bid consists of the par value of the securities that the buyer

wishes to purchase, as well as a minimum interest rate which the buyer is willing to accept. (Id.).  When auctions are successful, ARS typically trade at par. (Id.).

Each ARS is subject to a maximum interest rate that the issuer is willing to pay to the holder of the security.  (Id. ¶ 20).  Accordingly, bids must not exceed the maximum rate or they will not be accepted.  (Id.).  At the time of the auction, the auction agent collects all the bids and determines whether there is a sufficient number of bids below the maximum interest rate to cover all of the outstanding securities.  (Id.).  If so, the auction is considered successful, and the auction agent sets the interest rate for all securities at the lowest rate, known as the "clearing rate," necessary to insure the sale of all the securities offered.  (Id.).  If there is an insufficient number of bids below the maximum interest rate to cover all of the securities offered for sale, the auction agent declares a "failed auction." (Id.).  In the event of a failed auction, holders of ARS who attempted to sell their shares must continue to hold those securities until the next successful auction.  (Id. ¶ 21).  If the auctions were to continue to fail, holders of ARS might have to hold their securities to maturity, which may not occur for decades.  (Id.).  According to Tutor Perini, this is what occurred after the ARS market collapsed in February 2008.  (See id. ¶ 9).

When auctions fail, holders of ARS are still entitled to collect interest on their securities.  (See id. ¶¶ 22-24).  In such cases, the auction agent sets the interest rate at a predetermined level, known as the "default rate," which is specified in the offering materials for the particular ARS.  (Id. ¶ 22).  According to Tutor Perini, the default rate for many ARS is significantly higher than the prevailing interest rate.  (Id. ¶ 23).  This is

designed to make failed auctions financially unattractive to ARS issuers and encourage them to redeem securities rather than pay the default rate. (Id.). It is also designed to provide investors with additional compensation in the event of an auction failure. (Id.). Allegedly, however, the default rate for ARS backed by student loans is typically far lower than the default rates on other types of ARS. (Id.). Consequently, issuers have less incentive to redeem them, and investors who are forced to hold such securities following a failed auction receive lower interest payments. (See id. ¶ 24). Tutor Perini contends that nearly all of the ARS which remain frozen in its account at BAS consist of ARS that are backed by student loans. (Id.).

### BAS' Role in the Auction Process

The plaintiff alleges that BAS had various roles in the ARS market for which it earned significant fees. (Id. ¶ 25). In particular, BAS was an underwriter for ARS issues, including a leading underwriter for student loan backed ARS, and it also acted as an auction dealer, lead manager, auction agent and trustee. (Id.). In connection with its roles as underwriter and auction dealer, BAS allegedly was responsible for marketing and selling ARS to investors. (Id.). As a manager at auctions, BAS was responsible for submitting bids on behalf of its clients and other broker-dealers, while as auction agent, BAS was responsible for running auctions and setting interest rates. (Id.). In its capacity as trustee, BAS was responsible for providing investment information to securities holders. (Id.). Tutor Perini claims that BAS acted as the auction dealer for one out of the

ten ARS that remain frozen in its BAS account, and was the lead manager or co-lead manager for eight of those ARS. (Id. ¶ 26).

In addition to the roles described above, BAS, along with other Wall Street banks, allegedly participated in the auctions by submitting bids, known as "support bids," for its own account. (See id. ¶¶ 6, 36). The plaintiff claims that beginning in August 2007, when genuine liquidity in the ARS market dried up, BAS placed support bids at every auction in which it served as auction dealer, "so as to maintain the illusion of liquidity" that masked a lack of investor demand and an increasing risk of market failure. (See id.). The support bids allegedly caused a rapid rise in BAS's own inventory of ARS, thereby increasing the defendant's exposure to the market and placing unsustainable stress on its own balance sheet. (See id. ¶ 38). In fact, by the fall of 2007, BAS's own inventory had tripled from the previous year. (Id.). As described below, this allegedly led to efforts by BAS to reduce its own holdings of ARS by promoting sales of the securities to its clients.

**Overview of the Defendants' Alleged Fraud**

The plaintiff claims that throughout the course of the parties' relationship, the defendants were aware that Tutor Perini had always been a conservative investor, which required ready access to cash in order to fund its operations and its potential merger and acquisition activity. (Id. ¶ 16). The defendants also knew that the plaintiff's conservative investment strategy focused on safety and liquidity, and that Tutor Perini did not invest in stocks or speculative securities. (See id. ¶¶ 15-17). Indeed, from the start of its relationship with BAS in 2004, Tutor Perini allegedly informed its principal broker and

13

investment advisor at BAS that it wished to invest only in liquid securities having the highest credit rating.  (See id. ¶ 15).  The plaintiff claims that it trusted the defendants to protect its interests and to support its expressed investment goals.  (See id. ¶ 17).

According to the plaintiff, BAS promoted sales of ARS to Tutor Perini by describing them as safe, money market alternatives that were suitable for risk averse investors, such as the plaintiff, whose investment strategy focused on capital preservation and liquidity.  (Id. ¶ 2).  However, the plaintiff claims that at the time BAS was investing Tutor Perini's funds in ARS, the defendants knew, but did not disclose, that there were serious risks associated with the ARS market, including the risk of market collapse, which made such products entirely unsuitable for the plaintiff.  (Id. ¶¶ 3-4).  As Tutor Perini alleges:

> Commencing in August 2007 and lasting until February 2008 when the entire ARS market collapsed, defendants were abundantly aware of risks of illiquidity in the ARS market, which they did not disclose to Tutor Perini.  During this critical period, the defendants knew that the risks associated with investing in ARS were increasing exponentially, understood that the ARS market as a whole was in danger of collapse, and internally monitored the risk of the widespread auction failures to come.  Neither BAS nor [BANA] disclosed these risks to Tutor Perini.  Instead, at the very time these risks became palpable, BAS pitched ARS to Tutor Perini and invested hundreds of millions of dollars of Tutor Perini's funds in ARS.  These purchases were against Tutor Perini's interest, as defendants knew, but served defendants' undisclosed financial interests.

(Id. ¶ 4).  Further details regarding the defendants' alleged misconduct, including the alleged misrepresentations and omissions that were made to Tutor Perini in connection with BAS's sales of ARS to the plaintiff, are described below.

### BAS's Allegedly Improper Sales Practices

The events giving rise to the defendants' alleged improper conduct began in the summer of 2007, when the ARS market "underwent a dramatic shift in risk profile" due to the unprecedented failure of numerous auctions for ARS backed by collateralized debt obligations ("CDOs") and credit linked notes ("CLNs").  (Id. ¶ 5).  Allegedly, the failures which plagued CDO and CLN backed ARS impacted ARS backed by other types of collateral as well, including ARS backed by student loans and municipal bonds.  (Id. ¶¶ 5, 33).  The plaintiff claims that by August 2007, the defendants knew that the ARS market was facing unprecedented upheaval, that the risks of investing in ARS were increasing exponentially, and that the entire market was facing a threat of collapse.  (Id. ¶¶ 4, 31-32).  However, instead of warning its brokerage clients about the risks of the ARS market, BAS undertook a strategy to reduce it own exposure to ARS by promoting sales of ARS from its own inventory to its clients, including to Tutor Perini.  (See id. ¶¶ 35, 48).

As part of its strategy, BAS allegedly gave its brokers financial incentives to sell ARS, which incentives were not available for sales of more conservative investment products and were never disclosed to the plaintiff.  (Id. ¶ 48).  It also withheld information from its brokers about the increasing risks of ARS.  (Id.).  For example, on August 29, 2007, BAS allegedly organized a "Teach-In" at which it provided its sales force with

information about student loan backed ARS.  (Id. ¶ 49).  Allegedly, the Teach-In

materials promoted such securities as particularly good investments, and dismissed

concerns about market risks.  (Id.).  For instance, the Teach-In materials failed to disclose

the fact that high ARS interests rates reflected a deteriorating market and an increasing

risk of auction failures and illiquidity.  (Id.).  The materials also minimized the risks of

ARS by stating that the "rating agencies have never downgraded a student loan backed

transaction" and that "there is virtually no interest rate risk in student loan ARS."  (Id.).

Thus, although the defendants were well aware of the threats facing the market for

student loan backed ARS, the Teach-In materials failed to convey that information to the

brokers who sold ARS to BAS's clients.  (See id.).

The plaintiff claims that as the fall of 2007 wore on, the pressure on BAS to

reduce its own exposure to student loan ARS mounted.  (Id.).  On November 21, 2007,

the manager in charge of the company's ARS Desk allegedly announced that he was

engaging in an effort to minimize BAS's exposure to the risks of ARS by, among other

things, aggressively marketing ARS to institutional clients and offering discounts to

purchasers of ARS from BAS's own inventory.  (Id.).  Tutor Perini contends that it was a

target of these practices, and a victim of BAS's decision to provide its brokers with

misleading information about the true risks associated with investing in ARS.  (See id.

¶ 50).  It further contends that BAS's conduct enabled the defendant to defraud it out of

millions of dollars worth of assets.  (Id.).

Allegedly, BAS's sales practices, including its failure to properly train its brokers, violated the rules of the New York Stock Exchange and the National Association of Securities Dealers, and triggered investigations by the Securities and Exchange Commission ("SEC") and the North American Securities Administrators Association, a group of over a dozen state attorneys general.  (Id. ¶¶ 10, 50).  The plaintiff claims that those investigations resulted in settlements under which BAS had to repurchase ARS from its individual retail and small institutional clients, pay tens of millions of dollars in fines, and provide liquidity solutions to its larger institutional clients.  (Id. ¶ 10).  The plaintiff contends, however, that it has never been compensated by the defendants for the loss of liquidity that it has suffered with respect to its account.  (Id. ¶ 11).

### Alleged Misrepresentations and Omissions Regarding ARS

The ARS purchases at the heart of this case occurred during the time period from September 2007 to February 2008.  Thus, the plaintiff claims that despite its alleged awareness of the risk of illiquidity in the ARS market following the unprecedented auction failures that occurred in the summer of 2007, BAS began purchasing ARS backed by student loans and municipal bonds for Tutor Perini's account in September 2007.  (Id. ¶ 28; see also id. ¶¶ 31-32).  Between September 2007 and February 2008, when the ARS market collapsed, BAS proceeded to invest hundreds of millions of dollars of the plaintiff's funds in such securities.  (See id. ¶¶ 6-7, 9, 33).  Tutor Perini alleges that throughout this entire time period, BAS, through its principal investment advisor and broker for Tutor Perini's account, made various misstatements to Tutor Perini's treasurer about the

true nature of ARS.  (Id. ¶ 29).  It also claims that despite having frequent communica-

tions with both its investment advisor at BAS and its credit team at BANA, the defen-

dants failed to disclose material information to the plaintiff regarding the risks of such

investments.  (Id.).

Specifically, Tutor Perini contends that BAS misled it about the true nature of

ARS by equating the securities with money market funds and referring to them as "7-

day," "28-day," or "35-day" securities rather than long-term investment vehicles.  (Id.

¶ 30).  It also claims that BAS inaccurately described ARS as safe, liquid investments,

and a good alternative for Tutor Perini's cash holdings.  (Id.).  Moreover in September

2007, BAS allegedly misrepresented the risks posed by the August 2007 auction failures

in the CDO and CLN backed ARS market.  (See id. ¶¶ 31-32).  According to the plaintiff,

at that time, the defendants understood that there was turmoil in the ARS market, and

BAS officials were expressing fear that the auction failures could spread to student loan

and municipal ARS, thereby triggering a "meltdown" of the entire market.  (Id.).  Never-

theless, BAS told the plaintiff that there had been no auction failures in the history of the

student loan and municipal ARS market, and that auction failures in other segments of the

market were due to the poor credit quality of those securities.  (Id. ¶ 31).  Thus, BAS

allegedly misled Tutor Perini into believing that its purchases of ARS were appropriate,

and that its investments were safe, notwithstanding BAS's  knowledge to the contrary.

Allegedly, the defendants also failed to disclose information to Tutor Perini which

would have alerted it to the risks of investing in the ARS market.  In particular, the

plaintiff claims that the defendants failed to disclose the fact that auction failures in the CDO and CLN segment of the market dramatically increased the risk of auction failures and illiquidity in the market for student loan and municipal ARS.  (Id. ¶ 33).  They also failed to inform the plaintiff about certain practices, which temporarily prevented auction failures but concealed the waning demand for ARS and the increasing insecurity of such investments.  For instance, the defendants never disclosed that BAS, along with other banks, were placing support bids at auctions at an accelerating pace, or that as of August 2007, BAS was placing support bids at every auction for which it served as auction dealer.  (Id. ¶¶ 6, 36-37).  Because this practice gave the market an appearance of liquidity and concealed the fact that investor demand for ARS had dried up, Tutor Perini remained unaware of the risk that auctions would fail if the banks were to withdraw their support.  (See id. ¶¶ 36-37).  Indeed, it was the banks' decision to cease their support of the auctions in February 2008, which allegedly led to widespread auction failures and the collapse of the ARS market.  (Id. ¶ 37).

In addition to failing to inform Tutor Perini about the increasing use of support bids, the defendants allegedly chose not to reveal that ARS issuers were increasingly waiving the maximum interest rates on ARS.  (Id. ¶¶ 45-46).  According to the plaintiff, these so-called "maximum rate waivers"  prevented auction failures by allowing auctions to clear at higher rates.  (Id.).  However, the growing dependence on this practice signaled a heightened risk of auction failures in the future.  (Id.).  The plaintiff claims that the defendants knew of the widespread use of maximum rate waivers after August 2007, and

that BAS "supported and facilitated" this practice.  (Id. ¶ 46).  By failing to notify Tutor

Perini about the growing reliance on this practice, which had rarely been used before

August 2007, the defendants allegedly concealed from the plaintiff a "clear sign" of the

risks associated with its investments in ARS.  (See id. ¶ 45).

Another sign of trouble in the ARS market allegedly occurred in the fall and winter

of 2007.  The plaintiff claims that during that time period, interest rates for ARS were

approaching the maximum permissible rates for those products.  (Id. ¶ 43).  Allegedly, the

defendants knew that those rates were much higher than those of comparable securities,

and that they signaled increasing risk and decreasing liquidity in the ARS market.  (Id.).

Again, however, the defendants never disclosed those risks to Tutor Perini.  (Id.).  In

addition, the defendants allegedly failed to inform Tutor Perini about interest rate changes

relating specifically to student loan ARS.  (See id.).  As the plaintiff claims, such

securities typically traded at or just below the one-month London Interbank Offered Rate

("LIBOR").  (Id.).  During the fall of 2007, however, the spread between the LIBOR and

interest rates on student loan ARS grew to an unprecedented level.  (Id.).  As BAS

understood, this was indicative of falling demand by investors in the ARS market.  (Id.).

Thus, by omitting to disclose this information to Tutor Perini, the defendants once again

failed to alert the plaintiff about the growing risk to its investments.

Tutor Perini contends that the defendants were motivated to conceal the risks of

ARS in order to protect BAS's continued ability to earn significant fees from its work on

the investment banking side of the ARS business.  (Id. ¶ 35).  It also contends that they

were motivated by BAS's desire to promote its clients' purchases of ARS so that it could limit the need to use its own balance sheet to support the market, and so that it could foist risky ARS from its own burgeoning inventory onto clients like Tutor Perini.  (Id. ¶¶ 3, 33, 35).  In fact, by the fall of 2007, BAS allegedly understood that its balance sheet was facing unsustainable stress as a result of its use of support bids, and by December 2007, the problem had become dire.  (Id. ¶¶ 38-39).   Consequently, BAS took steps to reduce its holdings of ARS by promoting sales to its clients and actively discounting the securities, including student loan ARS that it had previously supported.  (Id. ¶ 39; see also id. ¶ 42).

Allegedly, the defendants did not disclose information to Tutor Perini about the growth of BAS's ARS inventory or the fact that BAS could not sustain its support for the ARS market.  (Id. ¶ 40).  Nor did it disclose the fact that it was attempting to reduce its own exposure to the market.  (Id. ¶ 42).  Instead, BAS's account representative falsely informed the plaintiff that the company was offering ARS to it clients at a discount as part of its year-end "window dressing" effort.  (Id.).  Additionally, during the winter of 2007, BAS, through its broker, told the plaintiff's account manager that it would continue to support the auctions for ARS that it sold to Tutor Perini.  (Id. ¶ 47).  The broker made the same representation in February 2008, just before BAS and other broker-dealers withdrew their support from the ARS market and allowed auctions to fail.  (See id. ¶¶ 47, 56).

The plaintiff claims that it never would have invested in ARS if it had known about the risks that were known to the defendants but never revealed to Tutor Perini. (Id. ¶ 8). According to the plaintiff, any "negligible conceivable advantage of ARS was grossly outweighed by the downside risks known to the defendants." (Id.).

## BANA's ARS Alert

On January 23, 2008, during the time period when BAS was purchasing ARS for Tutor Perini's account, the Chief Investment Office at BANA allegedly issued an alert to its investment professionals, which recommended that BANA portfolio managers begin to eliminate their clients' exposure to ARS. (Id. ¶ 52). The plaintiff contends that several of BANA's retail sales professionals forwarded the alert to traders working for BAS at the ARS Desk. (Id.). However, neither BAS nor BANA ever sent the alert or disclosed its contents to the plaintiff. (Id. ¶¶ 51-53). In fact, the plaintiff alleges that one senior employee at BAS's ARS Desk, after viewing the document, remarked, "Whoever sent this out should be shot!!  Are they trying to put us out of business?" (Id. ¶ 52).

Subsequently, BAS allegedly learned that the Chief Investment Office at US Trust[4] issued a similar alert warning the company's portfolio managers to take their customers out of the ARS market. (Id.). Again, however, the defendants failed to pass this information along to the plaintiff. (See id. ¶¶ 52-53). Instead, during the time period

---

[4] It is not clear from the complaint what if any relationship US Trust had with the defendants. According to the defendants, US Trust was a subsidiary of BANA. (Def. Mem. at 29).

when the alerts were issued, BAS purchased over $250 million worth of ARS for Tutor Perini's account, including over $227 million of ARS from BAS's own inventory.  (Id. ¶ 54).

The plaintiff contends that BANA's failure to forward the alerts to Tutor Perini "constitutes evidence of an agreement between the defendants to defraud Tutor Perini[,]" and that "[t]he defendants, by their conspiracy of silence, kept Tutor Perini in the dark about the risks of ARS and allowed Tutor Perini to rely on the fraudulent misrepresentations by BAS about the liquidity of these securities."  (Id. ¶ 53).  Additionally, it claims that

> defendants acted in unison as Tutor Perini's longtime, trusted lead lender and as Tutor Perini's ARS dealer – which Tutor Perini used as its broker dealer as a result of [BANA's] recommendation that it do so – to achieve this unlawful purpose by exercising a particular power of coercion over Tutor Perini they would not have had if acting independently.

(Id. ¶ 55).  However, it has not alleged any facts beyond those described above regarding the existence of an agreement or understanding between the defendants to commit fraud or otherwise cause harm to the plaintiff.

### Collapse of the ARS Market

The plaintiff claims that in early 2008, the risks that the defendants had concealed from it materialized when the ARS market collapsed.  (Id. ¶ 9).  Thus, at the end of January and beginning of February 2008, various broker-dealers stopped supporting ARS and allowed ARS auctions to fail.  (Id. ¶ 56).  On February 11, 2008 and in the days that

23

followed, BAS abruptly withdrew its support for ARS as well.  (Id. ¶¶ 37, 56).

Allegedly, the withdrawal of support by BAS and other broker-dealers led to widespread

auction failures across the ARS market.  (Id. ¶ 37).

At the time of the market collapse, Tutor Perini held nearly $200 million worth of

ARS in its account at BAS.  (Id. ¶ 56).  Since then the plaintiff has been able to redeem

the majority of its municipal bond backed ARS.  (See id. ¶ 24).  However, it has not been

able to redeem more than a few student loan ARS.  (See id.).  Consequently, it continues

to hold nearly $100 million in frozen ARS in its BAS account.  (Id. ¶ 57).

Additional factual details relevant to this court's analysis are described below

where appropriate.

## IV.  ANALYSIS

### A.    Count I: Claims for Securities Fraud Based on Misrepresentations and Omissions

In its First Cause of Action, Tutor Perini claims that the defendants engaged in

securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder,[5] by making material misrepresentations and omissions regarding

---

[5]  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection
with the purchase or sale of any security registered on a national securities exchange or any
security not so registered, or any securities-based swap agreement ... any manipulative or
deceptive device or contrivance in contravention of such rules and regulations as the [Securities
and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for
the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 states: "[i]t shall be unlawful for any
person, directly or indirectly, by the use of any means or instrumentality of interstate commerce,
or of the mails or of any facility of any national securities exchange, (a) To employ any device,
scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements made, in light of the circumstances

ARS.  In order to state a claim under Section 10(b) and Rule 10b-5 based on misrepre-

sentations and omissions, the plaintiff must plead the following basic elements: (1) a

material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or

sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, meaning a

causal connection between the misrepresentation or omission and the loss.  <u>Dura Pharm.,</u>

<u>Inc. v. Broudo</u>, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005).

The defendants have challenged the sufficiency of the plaintiff's pleading with respect to

the first, fourth and sixth elements.  For the reasons that follow, this court recommends

that the defendants' motion to dismiss these claims be denied.

<b>i.   Defendants' Challenges to the Alleged Misrepresentations</b>

The defendants first argue that the plaintiff failed to plead any affirmative

misrepresentations with the level of particularity required by the PSLRA and Rule 9(b).

(Def. Mem. at 11-14).  In order to support allegations of misleading statements under the

PSLRA, "the complaint must 'specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed.'"  <u>Rodriguez-Ortiz v. Margo Caribe,</u>

<u>Inc.</u>, 490 F.3d 92, 96 (1st Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)).  The First Circuit

---

under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

has determined that "[t]his standard is congruent and consistent with the pre-existing standards of this circuit under Rule 9(b)," pursuant to which the plaintiff is required to specify "the time, place, and content of an alleged false representation." Id. (quotations and citations omitted).  In the instant case, the defendants contend that Tutor Perini's misrepresentation allegations are vague and conclusory because they "fail to identify the speaker, allege where and when the statements were made, or particularize facts showing why the statement was fraudulent[,]" and they fail to distinguish the respective roles of BAS and BANA.  (Id. at 11).  However, this court finds that the plaintiff's allegations are sufficient to satisfy the requisite standard.

The complaint identifies the following affirmative statements that are alleged to have been misleading:

1. "[A]lthough BAS knew ARS were long-term bonds and posed significant liquidity risks," it misled the plaintiff by equating "ARS with money market funds" and referring to them "as '7-day,' '28-day,' or '35-day' securities, rather than as long-term investments."  It also "misrepresented to Tutor Perini that ARS were safe, liquid, and a good alternative for its cash holdings."  (Compl. ¶ 30).

2. Although the defendants knew by August 2007 that "the ARS market was experiencing an unprecedented upheaval[,]" and were "privately concerned about auction failures throughout the ARS market, including in the securities touted to Tutor Perini[,]" in September 2007, "BAS falsely represented the risks posed by such failures" when it told the plaintiff that "there had been no auction failures in the history of the student loan and municipal ARS market," and that "the August auction failures were due to the poor credit quality of those particular securities."  (Compl. ¶¶ 31-32).

3.  During the time period between December 2007 and early February 2008, when "BAS was desperately seeking to reduce its own exposure to ARS[,]" BAS' account representative "misrepresented to Tutor Perini that the reason [BAS] moved ARS off its own books and offered those ARS to clients at a discount was due solely to BAS' year-end and quarter-end 'window dressing' effort – without uttering a word about its true reason, namely to reduce exposure to ARS securities that were at increasing risk of becoming illiquid." (Compl. ¶¶ 41-42).

4.  During the winter of 2007, despite knowing the risks of investing in ARS, "including the unsustainable use of its own balance sheet to buy inventory[,] . . . the BAS broker on the Tutor Perini account represented to Tutor Perini's account manager that BAS would continue to support the auctions for the ARS that it sold to Tutor Perini." Furthermore, "the BAS broker made this same misrepresentation" to the plaintiff "on the very eve of [BAS] withdrawing its support from the ARS market in February 2008." (Compl. ¶ 47).

Tutor Perini alleges that all of the challenged statements were made by the principal investment advisor and broker at BAS who was responsible for Tutor Perini's account, and were conveyed to the Treasurer of Tutor Perini. (Compl. ¶ 29). It further claims that each of the alleged misrepresentations occurred between September 2007 and February 2008, when BAS withdrew its support for ARS and allowed the auctions to fail. (See Compl. ¶¶ 29, 56).

This court is satisfied that Tutor Perini has pled the affirmative misrepresentations with sufficient specificity. As described above, the plaintiff has described the substance of the challenged statements, has identified BAS rather than BANA as the source of the alleged statements, and has identified the speaker as the principal investment advisor and

broker for Tutor Perini's account.  Moreover, while the plaintiff has not indicated where the alleged misrepresentations took place, or provided the precise dates when the statements were made, it has described the time frame with enough detail "to put the defendants on notice of Rule 9(b)'s 'when' and 'where' requirements." Pearce v. Duchesneau Group, Inc., 392 F. Supp. 2d 63, 73 n.6 (D. Mass. 2005) (finding that allegations showing that plaintiff first contacted defendants in February 2000, and closed her investment account on November 20, 2001, was sufficient for purposes of Rule 9(b) pleading requirements).  Furthermore, it is reasonable to infer that the alleged misrepresentations were conveyed from the office of the individual who acted as the principal investment advisor and broker for the plaintiff's account.  See Akamai Techs., Inc., 764 F. Supp. 2d at 267 (finding it "reasonable to presume," where plaintiffs failed to identify a specific speaker in support of its misrepresentation claims, that ARS purchases were prepared by defendants' employees who were responsible for plaintiff's account (quotations and citations omitted)); Pearce, 392 F. Supp. 2d at 73 n.6 (finding that court could "fairly infer" from the fact that defendants' company was located in Weston, Massachusetts that defendants "made any alleged misrepresentations there").  Thus, this court finds that Tutor Perini has adequately pled the time, place and content of the alleged misrepresentations.  See Akamai Techs., Inc., 764 F. Supp. 2d at 265-67 (holding that particularity requirements necessary to plead material misrepresentations under Rule 9(b) were satisfied in case where plaintiff alleged that "in the fall of 2007[,]" "[a]t the same

time that it was reducing its own exposure" to ARS, "[defendant] continued to tout ARS

to Plaintiffs as safe and liquid investments").

This court also concludes that the plaintiff has sufficiently explained why BAS's

statements were misleading.  As the plaintiff alleges in the complaint, at the same time

BAS was promoting sales of ARS to Tutor Perini, it had determined internally that the

market for such securities was at risk of a "meltdown" and that BAS would need to divest

itself of its own ARS inventory in order to avoid the possibility that BAS would end up

with over a billion dollars worth of frozen assets on its balance sheet.  (See Compl. ¶¶ 32-

33, 39).  Thus, by assuring Tutor Perini that ARS were a safe alternative for its cash

holdings, suggesting that student loan and municipal ARS would not be impacted by the

August 2007 auction failures, and describing its sales of ARS from its own inventory as

"window dressing," BAS led the plaintiff into believing that its ARS investments were

safe, and that the risk of illiquidity was minimal, notwithstanding its own belief to the

contrary.[6]  With respect to BAS's promises to continue its support for the auctions, the

plaintiff has alleged facts showing that by late 2007, BAS knew that it was "very

outsized" in its exposure to student loan ARS, that it was reaching the limits of its ability

to engage in support bids, and that the use of its own balance sheet to purchase ARS had

---

[6]  Even if the plaintiff has not shown that certain of BAS's statements, such as its statement that "the August auction failures were due to poor credit quality of those particular securities[,]" were false, when read in the context of the complaint as a whole, Tutor Perini has sufficiently alleged that those statements were misleading because they falsely assured the plaintiff that ARS were safe and would not be impacted by auction failures in other segments of the market.

29

become "unsustainable."  (See id. ¶¶ 38-40).  Therefore, its assurances of continuing

support, particularly just before the collapse of the market in February 2008, were

similarly misleading.

The defendants nevertheless argue that the alleged misrepresentations are inade-

quate to support a claim because they are not linked in any way to the ARS purchases at

issue in this case.  (Def. Mem. at 12-13; Def. Reply Mem. (Docket No. 50) at 9-10).  This

court disagrees.  The plaintiff alleges that all of the misrepresentations were made

between September 2007 and February 2008, during the time period when BAS was

purchasing ARS for Tutor Perini's account, and that the misrepresentations concerned the

nature and risks of those securities.  (See Compl. ¶¶ 9, 28-29, 32 n.4).  It also alleges that

as a result of the defendants' misrepresentations and omissions, it continues to hold

nearly $100 million worth of frozen ARS in its BAS account.  (See id. ¶ 9).  Accordingly,

the plaintiff has alleged that the misrepresentations concerned the ARS which BAS

purchased for Tutor Perini's account, and related to the ARS which continue to remain

frozen in that account today.

This court is not persuaded by the defendants' argument that more specificity is

needed in order to link the alleged misrepresentations to the specific ARS which remain

frozen in Tutor Perini's account.  In support of this argument, the defendants rely on a

decision from the Southern District of New York in which the court held that the

plaintiff's allegations against an investment advisor and broker who had sold it Merrill

Lynch ARS were insufficient to meet the particularity requirements for pleading misstate-

ments and omissions in part because the plaintiff had failed "to specify what precise misstatements or misrepresentations occurred with respect to *the specific Merrill ARS at issue*[.]  See In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d 512, 533 (S.D.N.Y. 2012) (emphasis in original).  However, this court finds that the Merrill Lynch court's justification for that ruling was based on the particular circumstances of that case and is not applicable here.

Significantly, in the Merrill Lynch case, the plaintiff claimed that the defendant broker, by its alleged misstatements and omissions, had failed "to disclose adequately [Merrill Lynch's] ARS practices and procedures."  Id.  However, the court determined that Merrill Lynch had in fact disclosed its ARS practices on its website well before the plaintiff purchased the Merrill Lynch ARS at issue.  Id.  Thus, the court stated that the requirement to tie the broker's misrepresentations to the particular Merrill Lynch ARS at issue was necessary in order to "overcome the conclusion that the [Merrill Lynch] ARS practices were adequately disclosed."  See id.

Additionally, the statements challenged by the plaintiff in Merrill Lynch involved generalities about the plaintiff's account and ARS, and the plaintiff failed to allege facts showing "that the misstatements described were *in any way* associated with the particular Merrill ARS at issue in [the] litigation."[7]  Id. at 534 (emphasis added).  Because the

---

[7] Specifically, the statements challenged by the plaintiff in Merrill Lynch included an email referring generally to the contents of the plaintiff's account and not to ARS specifically; general statements, made months before any of the ARS purchases at issue, regarding the liquid nature of ARS; a notation on an account statement generally describing ARS as "CashEQ" without

plaintiff admitted to having purchased over $300 million worth of ARS prior to purchasing the Merrill Lynch ARS involved in the case, and had "moved in and out of [those] securities as needed to fund its operational requirements[,]" it was not even clear whether the alleged misrepresentations concerned the Merrill ARS that were the subject of the case or whether they concerned entirely unrelated purchases of ARS by the plaintiff.  See id. at 534 n.9.

In the instant case, as described below, this court finds that the question whether BAS made adequate disclosures regarding the subject matter of BAS's allegedly misleading statements raises questions of fact which must await further development of the evidentiary record.  Accordingly, unlike the situation in Merrill Lynch, here there is no need for Tutor Perini to overcome any such disclosures by tying BAS's statements more precisely to Tutor Perini's ARS.   Furthermore, there is nothing in Tutor Perini's complaint to suggest that BAS's misrepresentations concerned any ARS other than those that BAS purchased for Tutor Perini's account during the time period between September 2007 through February 2008, including the student loan backed ARS which currently remain frozen.  Therefore, in contrast to the circumstances presented in Merrill Lynch, the conduct challenged here is sufficiently linked to the ARS at issue in the case.

---

indicating whether the Merrill Lynch ARS were so identified; meetings and/or communications between unidentified individuals which lacked any specificity regarding the specific securities under discussion; and "dateless, unspecific statements" attributed to no particular individual from the defendant's company indicating that the defendant "had read and reviewed the relevant Merrill ARS offering materials and represented that they fell within Plaintiff's investment parameters."  In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d at 533-34.

This court is similarly unpersuaded by the defendants' assertion that Rule 9(b) has not been satisfied because the plaintiff failed to plead "the means of communication[,]" or by its assertion that BAS's disclosures, including disclosures that it made on its website and disclosures that it claims to have sent to Tutor Perini, "squarely refute [the plaintiff's] allegations that BAS misrepresented ARS' liquidity and the risk of failed auctions." (Def. Mem. at 13, 15).  As described above, the law of this Circuit does not impose a requirement upon plaintiffs in a securities fraud action to plead the means of the misrepresentations.  See Rodriguez-Ortiz, 490 F.3d at 96 (describing heightened pleading requirements for securities fraud cases).  Accordingly, this court declines to do so here.  With respect to the defendants' assertion that the alleged misrepresentations could not have been misleading in light of BAS's disclosures, this court finds that the argument raises factual questions that require further development of the record.  As described above, this court has declined to consider the extraneous materials submitted by the defendants in support of their motion to dismiss.  Therefore, BAS's disclosures are not before the court and the substance of those disclosures cannot be evaluated at this stage in the proceedings.

Finally, this court disagrees with the defendants' contention that BAS's assurances that it "would continue to support the auctions" should be dismissed because the statements constitute mere puffery which is not actionable under the securities laws, and because the statements are subject to protection under the "bespeaks-caution" doctrine. (Def. Mem. at 16-17; see also Def. Reply Mem. at 12-13).  "[T]o be deemed 'puffery,' a

statement must be 'so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information.'" In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (quoting Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 250 (D. Mass. 2006)).  In other words, the statement is immaterial as a matter of law.  See Rosenbaum Capital L.L.C. v. Boston Commc'ns Group, Inc., 445 F. Supp. 2d 170, 176 (D. Mass. 2006) (explaining that "statements constituting 'corporate puffery'... are immaterial as a matter of law" (citation omitted)).  Here, however, BAS's alleged assurances that it would continue to support the auctions were not vague or unclear.  Moreover, as the alleged "market-maker for the ARS it sold to Tutor Perini," BAS's support for the auctions could mean the difference between a successful auction and a failed one.  (See Compl. ¶ 47).  Therefore, this court cannot conclude, as a matter of law, that a reasonable investor in Tutor Perini's position would have found its statements unimportant.

The defendants' reliance on the bespeaks-caution doctrine fares no better.  "The 'bespeaks caution' doctrine 'is essentially shorthand for the well-established principle that a statement or omission must be considered in context.'" Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993)), abrogated on other grounds by 15 U.S.C. § 78u-4(b)(2).  "It embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out

34

differently, the 'soft' statements may not be materially misleading under the securities laws." Id.  In the instant case, the question whether the doctrine protects BAS's statements must await further development of the record.

In support of their assertion that the bespeaks caution doctrine applies, the defendants argue that "BAS warned [Tutor] Perini on a near-daily basis that because BAS 'is not obligated' to continue bidding in auctions, [Tutor] Perini 'should not assume that BAS will place a bid in any particular auction, or that Failed Auctions or unfavorable auction rates will not occur.'"  (Def. Mem. at 17).  However, this argument is based on materials outside the complaint.  (See id. at 7, 17).  Therefore, the question whether BAS's representations were accompanied by adequate cautionary disclosures cannot be resolved on a motion to dismiss.

### ii.   Defendants' Challenges to the Alleged Omissions

The defendants also challenge Tutor Perini's omissions allegations on the grounds that they are insufficient to plead that the defendants omitted to disclose material facts regarding the liquidity risks associated with investments in ARS.  Again, this court finds that the defendants' arguments are unpersuasive and that the plaintiff's allegations are sufficient to state a claim.

### Alleged Failure to Plead Omissions with Sufficient Particularity

The defendants first argue that certain of the plaintiff's allegations are too conclusory to meet the particularity requirements of Rule 9(b) and the PSLRA.  In particular, the defendants take issue with Tutor Perini's allegation that BAS failed to disclose that it

"placed necessary support bids in every auction" for which it acted as auction dealer in order to "maintain the illusion of liquidity."  (Def. Mem. at 17 (quoting Compl. ¶ 36)). They contend that "Rule 9(b) prohibits such broad generalized allegations about a broker-dealer's ARS bidding practices."  (Id.).  Instead, according to the defendants, the complaint must contain details such as "(i) the number of auctions for which BAS served as lead broker-dealer, (ii) the number of auctions for which BAS was not a lead broker-dealer, (iii) the size of BAS's alleged support bids, and (iv) why such bids were 'necessary'" in order to state a claim.  (Def. Reply Mem. at 13-14).  This court finds that the defendants have construed the plaintiff's omissions claims too narrowly, and that dismissal is not warranted on this basis.

Despite the defendants' implication to the contrary, the plaintiff's omissions claims do not challenge the appropriateness of BAS's bidding practices, but instead are focused more broadly on the defendants' failure to inform Tutor Perini about the risks of ARS.  As the plaintiff alleges,"[t]he defendants knew that as of August 2007, BAS placed necessary support bids in every auction for which it was the lead broker-dealer . . . so as to maintain the illusion of liquidity in the absence of genuine investor demand, and that other banks followed similar practices."  (Compl. ¶ 36).  Moreover, according to the plaintiff, BAS continued to place support bids at an accelerating pace throughout the fall of 2007 and early winter of 2008, in order "to stave off auction failures and to perpetuate the false illusion of true investor demand – and therefore liquidity – in the ARS market." (Id. ¶ 6; see also id. ¶ 37).  Although BAS allegedly knew that such artificial support for

36

the auctions "was unsustainable, and that it masked the heightened risk of failure" in the ARS market, the "defendants uttered not a word of these risks to Tutor Perini." (<u>Id.</u> ¶¶ 6-7).  Consequently, Tutor Perini remained unaware of the increasing risk that its investments in ARS would become illiquid.

Unlike the cases on which the defendants rely, the plaintiff is not asserting a market manipulation claim based on the defendant's bidding practices.  <u>Compare</u>, <u>e.g.</u>, <u>Wilson v. Merrill Lynch & Co., Inc.</u>, 671 F.3d 120, 136 (2d Cir. 2011) (cited by defendants) (finding that plaintiff failed to state a claim for market manipulation based on defendant's support bidding activities where defendant disclosed details about such activities on its website); <u>In re Citigroup Auction Rate Sec. Litig.</u>, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009) (cited by defendants) (finding that plaintiff failed to state a claim for market manipulation based on support bidding activities where complaint failed to include "specific allegations as to which Defendants performed what manipulative acts at what times and with what effect").  Moreover, at least one other court in this district has found that allegations like those set forth in Tutor Perini's complaint were sufficiently detailed to support the plaintiff's claims of securities fraud based on omissions about the risk of illiquidity in the ARS market.  <u>See</u> <u>Akamai Techs., Inc.</u>, 764 F. Supp. 2d at 265, 267 (finding that plaintiff's omissions allegations, including allegations relating to defendants' "strategic and undisclosed bidding in ARS auctions," met the particularity requirements of Rule 9(b) and the PSLRA).  This court agrees with the <u>Akamai</u> court's conclusion that in the context of a case like this one, no more is necessary to support a

claim for securities fraud based, in part, on the defendants' failure to disclose information about the defendant's increasing reliance on support bids as a means of preventing auction failures.  Therefore, this court finds that dismissal is not appropriate.

This court also concludes that the defendants' challenges to other omissions allegations are similarly unpersuasive.  Thus, the defendants contend that the plaintiff "alleges no facts to support its vague characterization that [the defendants] 'did not disclose to Tutor Perini the unsustainable use of BAS's balance sheet' (Compl. ¶ 40), such as (i) whether BAS's balance sheet limited ARS, (ii) what that limit was, and (iii) how BAS's ARS inventory compared to that limit over time."   (Def. Mem. at 18).  They also challenge Tutor Perini's allegations regarding the defendants' failure to disclose the increased reliance by ARS issuers on maximum rate waivers, arguing that the plaintiff's failure to particularize "even the most basic facts about such waivers, such as (i) which issuers and which securities, (ii) how and when those issuers obtained the waivers, (iii) how and when 'BAS supported and facilitated these waivers,' and (iv) which of [Tutor] Perini's ARS, if any, were affected."  (Id. (quoting Compl. ¶¶ 45-46)).  Again, however, the defendants ignore the fact that Tutor Perini's claims are focused on the defendants' failure to disclose the risks of investing in ARS and not on practices used by the defendants and others to manipulate the market for ARS.  Compare In re Bank of Am. Corp. Auction Rate Sec. (ARS) Mktg. Litig., No. 09-md-02014 JSW, 2011 WL 740902, at *9-10 (N.D. Cal. Feb. 24, 2011) (cited by defendants) (finding that plaintiffs failed to plead a market manipulation claim based on maximum rate waivers because they "fail[ed] to

allege particularized facts demonstrating the effect [that] the rate cap waivers had on the market for [defendants'] ARS").  Moreover, as described above, Tutor Perini has alleged that the defendants' omissions regarding these matters took place during the time period from September 2007 to February 2008, that the individuals responsible for communicating with Tutor Perini included Tutor Perini's principal investment advisor at BAS and members of its credit-side relationship team at BANA, and that omissions regarding the unsustainable use of BAS's balance sheet and the reliance on maximum rate waivers were misleading because they masked the existing illiquidity in the ARS market, as well as the heightened risk that the entire market would fail.  (See Compl. ¶¶ 6, 29, 36, 38-46).  These allegations are sufficiently specific to satisfy the requirements for pleading omissions.  See Akamai Techs., Inc., 764 F. Supp. 2d at 267 (finding that plaintiffs' omissions allegations, including allegations that defendant failed to disclose diminishing demand for ARS and risk of auction failures, were sufficient to meet particularity requirements of PSLRA and Rule 9(b)).

Finally, this court rejects the defendants' contention that Tutor Perini's allegation that BAS's support bidding practices were "unsustainable" does not satisfy Rule 9(b) because it is based on nothing more than the fact that BAS ultimately withdrew its support for the auctions and therefore amounts to an impermissible claim of "fraud-by-hindsight."  (Def. Reply Mem. at 14).  The plaintiff alleges that in the fall of 2007, as a result of its support bids, "BAS inventory of ARS reached triple the level of inventory it held during the same time period of the previous year[,]" prompting the company's risk

manager to issue a warning regarding BAS's exposure to student loan ARS. (Compl. ¶ 38). It also alleges that by December 2007, the impact of the support bids on BAS's balance sheet had grown dire. (Id. ¶ 39). As the plaintiff claims:

> On December 11, 2007, a BAS senior executive reviewing BAS' efforts to reduce its holdings of ARS warned that BAS was reaching the limit of its ability to bid in auctions and support the market. Six days later, on December 17, a BAS senior executive instructed the manager in charge of the ARS Desk to "leave no stone unturned in marketing [ARS] to our long term investor base ASAP" because BAS needed to reduce its own inventory. In January 2008, the ARS Desk was "actively discounting" ARS it had previously supported, including two student loan ARS, in order to reduce BAS' own ARS inventory to encourage sales of ARS off its books.

(Id.). Accordingly, the plaintiff has alleged facts supporting its claim that during the time period when BAS was purchasing ARS for Tutor Perini's account, BAS knew that its support for the market could not be sustained. The defendants' assertion that Tutor Perini has merely alleged fraud by hindsight is without merit.

## BAS's Alleged Disclosures

The defendants argue that even if Tutor Perini's omissions allegations are specific enough to pass muster under Rule 9(b) and the PSLRA, certain of those allegations are not actionable and must be dismissed because BAS disclosed the allegedly concealed information. In particular, the defendants contend that BAS's disclosures directly refute Tutor Perini's claims that the defendants failed to inform it of BAS's increasing use of support bids to foster the illusion of illiquidity, the rising inventory of ARS resulting from BAS's support bidding practices, and information regarding maximum rates for the ARS

that BAS held in its inventory.  (Def. Mem. at 19-21).  However, this argument is

dependent upon materials outside the complaint, and raises questions of fact that must

await discovery.  Accordingly, while the information offered by the defendants to rebut

the plaintiff's omissions may be relevant on a motion for summary judgment, it cannot

support dismissal at this point in the litigation.

### Alleged Pleading Inconsistency

The defendants also challenge Tutor Perini's allegations relating to BAS's support

bidding practices on the grounds that such allegations are internally inconsistent and

therefore illogical.  Specifically, the defendants argue:

> [o]n one hand [Tutor] Perini alleges that it did not know the
> significant role that broker-dealer bidding played in preventing
> auction failures.  (Compl. ¶ 36).  But on the other hand, [Tutor]
> Perini alleges that it purchased ARS at least in part based on
> representations that BAS "would not withdraw its support of the
> auctions."  (*Id.* ¶ 47).  [Tutor] Perini cannot simultaneously plead (i)
> ignorance of BAS's auction-support bids, and (ii) reliance on BAS's
> promise to continue making support bids.

(Def. Mem. at 21).  Therefore, they contend that such allegations cannot support Tutor

Perini's claims.

This court finds that the allegations at issue are not necessarily inconsistent.  As

the plaintiff argues in its opposition to the motion to dismiss, Tutor Perini does not claim

that it was unaware of BAS's use of support bids.  Rather, "it pleads that [the defendants]

concealed that flagging demand required BAS to bid in every auction to keep the ARS

market afloat, and that BAS's support bids were being made 'to foster the illusion of

liquidity.'"  (Pl. Opp. Mem. at 15 (quoting Compl. ¶ 37)).  Thus, what Tutor Perini allegedly did not know was that "genuine liquidity in the market had evaporated" and was entirely dependent upon the support bidding practices of BAS and other Wall Street banks.  (See Compl. ¶ 36).  Tutor Perini's claim that it relied on BAS's false assurances that it would continue to support the market for ARS that it sold to the plaintiff does not necessarily undermine the plaintiff's assertion that it was unaware of the gravity of the situation or the critical role that BAS's support bidding practices played in the ARS market.  Therefore, this court recommends that the parties have an opportunity to explore this issue further during discovery.[8]

### iii.  Reliance on Alleged Misrepresentations and Omissions

As described above, in order to state a claim for securities fraud based on misrepresentations and omissions, the plaintiff must plead reliance.  See Dura Pharm., Inc., 544 U.S. at 341, 125 S. Ct. at 1631.  In the instant case, Tutor Perini alleges that it relied on BAS's representations that it "would follow Tutor Perini's instructions and invest Tutor Perini's money in conservative and liquid securities[.]"  (Compl. ¶ 63).  It also alleges that it never would have invested in ARS "[h]ad the risks that the defendants knew been disclosed to Tutor Perini[.]"  (Id. ¶ 8).  Accordingly, Tutor Perini has pled this

---

[8]  This court finds that it is also not necessarily inconsistent for Tutor Perini to allege that BAS was increasing its ARS inventory through support bids while at the same time attempting to foist ARS from its own inventory onto clients such as Tutor Perini.  (See Def. Reply Mem. at 17-18).  These allegations merely depict a situation in which the defendant was desperately trying to avoid auction failures and save the market from collapse without reaching the limit of its own ability to take more ARS onto its balance sheet.

element of its claim.[9]  See Akamai Techs, Inc., 764 F. Supp. 2d at 268 (finding that

plaintiffs pled reasonable reliance where plaintiffs alleged that they relied "on

[defendant's] representations that [it] would abide by its instructions to purchase only

safe and liquid investments"); In re UBS Auction Rate Sec. Litig., No. 08 Civ.

2967(LMM), 2010 WL 2541166, at *24 (S.D.N.Y. Jun. 10, 2010) (plaintiffs' claim that

they would not have purchased defendant's ARS, or would not have purchased such

securities at the same prices and/or interest rates, if not for the defendants' manipulation

of the market, was sufficient to plead reliance element of market manipulation claim).

Nevertheless, the defendants argue that Tutor Perini "cannot plead that it

reasonably relied on [the defendants'] alleged misrepresentations and omissions because

it received numerous written disclosures about the very risks [Tutor] Perini alleges [the

defendants] concealed."  (Def. Mem. at 22-23).  They also argue that the plaintiff's

reliance allegations are defeated by Tutor Perini's own trading history, which shows that

the plaintiff was selling ARS during times when the alleged misrepresentations and

omissions were made.  (Id. at 24).  Because these arguments are dependent upon

materials outside the complaint, which materials this court has declined to consider at this

---

[9]  In light of this court's conclusion that Tutor Perini has pled reliance, it is not necessary
at this time to evaluate whether the plaintiff is entitled to a presumption of reliance because its
claims involve alleged omissions.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
552 U.S. 148, 159, 128 S. Ct. 761, 769, 169 L. Ed. 2d 627 (2008) (explaining that "if there is an
omission of a material fact by one with a duty to disclose, the investor to whom the duty was
owed need not provide specific proof of reliance").

stage in the case, the defendants have not shown that the plaintiff's securities fraud claims should be dismissed for failure to plead reliance.

### iv.   Loss Causation

The defendants also argue that Tutor Perini has failed to plead loss causation because it has failed to allege facts showing that the defendants' conduct caused its economic loss.  To plead loss causation, "the Plaintiff need[] only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 46 (D. Mass. 2006) (quoting Dura Pharm., Inc., 544 U.S. at 347, 125 S. Ct. at 1634).  This requirement is met when the plaintiff alleges facts showing that "the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk[.]"  Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).  "A loss is foreseeable if it is 'within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor[.]'"  Defer LP v. Raymond James Fin., Inc., No. 08 Civ. 3449(LAK), 2010 WL 3452387, at *12 (S.D.N.Y. Sept. 2, 2010) (quoting In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009)).

This court finds that Tutor Perini has satisfied this element of its securities fraud claims.  In its complaint, Tutor Perini alleges that were it not for the defendants' misrepresentations and omissions about the risks of illiquidity in the ARS market and the threat of market collapse, it would never have invested in those securities.  (See Compl. ¶ 8).  It also alleges that "[i]n February 2008, the very risk that the defendants had concealed

44

from Tutor Perini materialized: the market for the ARS held by Tutor Perini collapsed." (Id. ¶ 9).  As a result, the plaintiff claims that it has been left with nearly $100 million in frozen ARS that will not mature for decades.  (Id.).  These allegations are sufficient to plead loss causation.  See Akamai Techs., Inc., 764 F. Supp. 2d at 268 (allegations that "but for [Defendant's] misconduct, Akamai would not have owned ARS when the ARS market froze" were sufficient to plead loss causation (alterations in original; quotations omitted)); Defer LP, 2010 WL 3452387, at *13 (allegations that "the materialization of the allegedly concealed risk caused plaintiffs' injuries" were sufficient to plead loss causation).

The defendants argue that Tutor Perini's loss causation allegations are inadequate because they fail to isolate the losses attributable to the defendants' alleged conduct from the loss attributable to market-wide conditions.  Specifically, the defendants assert that "ARS auctions failed not because of 'concealed' broker-dealer bidding practices or maximum-rate waivers, but because the economic crisis that 'spread through the credit markets' in 2007-08 . . . caused an unprecedented decline in investor demand that rendered broker-dealers unable to support auctions for the first time in history."  (Def. Mem. at 26).  However, this argument misconstrues Tutor Perini's claim.  The plaintiff does not claim that BAS's bidding practices or the maximum rate waivers caused its losses.  Rather, it claims that it was the defendants' failure to disclose the risks of illiquidity and market collapse that led Tutor Perini to invest in ARS and to suffer loss when the market for ARS froze in February 2008.  As described above, such allegations

are adequate to establish the necessary causal connection between the defendants' alleged conduct and Tutor Perini's harm.

Nor can the defendants defeat Tutor Perini's claim of loss causation by relying on disclosures and publicly available offering memoranda for Tutor Perini's ARS.  (See Def. Reply Mem. at 18-19).  While the defendants may choose to rely on that evidence at the summary judgment stage in the case, the materials are outside the complaint and will not be considered now.  Accordingly, the defendants have not shown that Tutor Perini's securities fraud claims based on misrepresentations and omissions should be dismissed.

**B.**     **Count I: Claims for Securities Fraud Based on Unsuitability**

Tutor Perini also claims that the defendants engaged in securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by selling it securities that were unsuitable in light of the plaintiff's investment objectives.  The defendants have moved to dismiss these claims for failure to adequately plead unsuitability.  For the reasons that follow, this court recommends that the defendants' motion be denied with respect to these claims as well.

Courts have recognized that there are two different types of unsuitability claims. As the Tenth Circuit has explained, "[s]ome courts examining a § 10(b), Rule 10b-5 unsuitability claim have analyzed it simply as a misrepresentation or failure to disclose a material fact" in which "the broker has omitted telling the investor the recommendation is unsuitable for the investor's interests."  O'Connor v. R.F. Lafferty & Co., Inc., 965 F.2d 893, 897 (10th Cir. 1992).  Under that theory,

46

> a plaintiff can establish § 10(b), Rule 10b-5 liability by showing that
> in connection with the purchase or sale of a security – the broker
> made an untrue statement of a material fact, or failed to state a
> material fact, that in so doing, the broker acting knowingly with
> intent to deceive or defraud, and that plaintiff relied on the
> misrepresentations, and sustained damages as a proximate result of
> the misrepresentations.

Id.  See also Lefkowitz v. Smith Barney, Harris Upham & Co., Inc., 804 F.2d 154, 155

(1st Cir. 1986) (analyzing unsuitability claim under a misrepresentation or omission

theory).  Alternatively, a plaintiff may "assert[ ] an unsuitability claim based on fraud by

conduct."  O'Connor, 965 F. 2d at 898.  Under this second theory,

> [t]he plaintiff must prove (1) the broker recommended (or in the case
> of a discretionary account purchased) securities which are unsuitable
> in light of the investor's objectives; (2) the broker recommended  or
> purchased the securities with an intent to defraud or with reckless
> disregard for the investor's interests; and (3) the broker exercised
> control over the investor's account.

Id.  Here, Tutor Perini contends that "the Bank misrepresented the nature of ARS and

omitted material information about mounting risks of auction failure."  (Pl. Opp. Mem. at

29).  It appears, therefore, that Tutor Perini is proceeding under a misrepresentation or

omission theory.

    The defendants first argue that Tutor Perini's unsuitability claim must be

dismissed because its allegations regarding its investment objectives are too vague and

conclusory to state such a claim.  (Def. Mem. at 28).  In order to prevail on its claim, the

plaintiff must demonstrate that "the quality of the securities purchased for [its] account

was inappropriate in light of [its] investment objectives."  Lefkowitz, 804 F.2d at 155.

47

This court finds that Tutor Perini has alleged sufficiently specific facts relating to its investment objectives to satisfy this requirement.

The plaintiff alleges that throughout the course of its relationship with the defendants, the defendants knew that Tutor Perini was a conservative investor, which required cash to be available on short notice in order to fund its operations, as well as its potential merger and acquisition activities.  (Compl. ¶ 16).  Additionally, the defendants knew that Tutor Perini's investment strategy was focused on safety and security, and that as a result, Tutor Perini invested in conservative, highly liquid instruments, but did not invest in stocks or speculative securities.  (Id. ¶¶ 15-17).  Moreover, throughout the entire course of its relationship with BAS, Tutor Perini allegedly informed its principal investment advisor and broker at BAS about its conservative investment strategy, including its interest in investing only in liquid securities having the highest credit rating. (See id. ¶ 15).  This court finds that these facts are adequate to support Tutor Perini's claim of unsuitability.

The defendants also argue that the unsuitability claim must fail because Tutor Perini has not alleged any particularized facts to show that the defendants exercised control over the plaintiff's BAS account.  (Def. Mem. at 28; Def. Reply Mem. at 19). However, as described above, a plaintiff is not required to demonstrate such control in order to prevail on an unsuitability claim based on material misrepresentations or omissions.  See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1032 (4th Cir. 1997) (setting out elements of a § 10(b) unsuitability claim based on

48

misrepresentations or omissions).  Because it appears that Tutor Perini is proceeding under such a theory, dismissal is not appropriate on the grounds that the plaintiff failed to allege control.  Accordingly, this court recommends that the motion to dismiss Tutor Perini's unsuitability claim be denied.

### C.   Counts II - X: State Law Claims[10]

By their motion to dismiss, the defendants also are seeking the dismissal of Tutor Perini's state law claims, including its claims for common law fraud (Counts II-III), negligent misrepresentation (Count IV), violation of Mass. Gen. Laws ch. 93A (Count V), civil conspiracy (Counts VI-VII), violation of Mass. Gen. Laws ch. 110A, § 410(a)(2) (Count VIII), breach of contract (Count IX), and conversion (Count X).  The defendants argue that each of these claims must be dismissed because Tutor Perini has failed to meet the heightened pleading requirements of Rule 9(b) and, if applicable instead, the notice pleading requirements of Fed. R. Civ. P. 8.  (Def. Mem. at 28-30).  As described below, this court finds that Tutor Perini has failed to state claims for civil conspiracy, breach of contract or conversion.  However, the defendants' motion to dismiss the remaining claims should be denied.

### i.   Applicable Pleading Standard

---

[10]  Tutor Perini argues that the court should disregard the defendants' motion insofar as it seeks dismissal of the state law claims because the defendants' arguments for dismissal of those claims are too threadbare to warrant consideration.  (Pl. Opp. Mem. at 29).  While this court agrees that the defendants' arguments are somewhat cursory, they nevertheless provide a basis for dismissal and cite to supporting case law.  Therefore, this court finds that the defendants' arguments are sufficiently developed to merit consideration.

A threshold issue raised by the defendants' motion to dismiss the state law claims is whether Rule 9(b) applies to all of those claims.  The defendants argue that "Rule 9(b)'s heightened pleading standards apply to all of [Tutor] Perini's state-law claims because they are based on the same allegedly fraudulent conduct regarding [Tutor] Perini's ARS purchases."  (<u>Id.</u> at 28).  However, the cases relied on by the defendants do not support their assertion that Rule 9(b) applies to common law claims unless "the core allegations" supporting the claims "effectively charge fraud."  <u>See</u> <u>N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 15 (1st Cir. 2009).  Accordingly, this court will apply the heightened pleading standards required by Rule 9(b) only to the extent that the claims at issue are based on the defendants' allegedly fraudulent conduct. Otherwise, the claims are subject to the notice pleading standards set forth in Fed. R. Civ. P. 8(a).

> ### ii.   Counts II-IV, VIII: Claims for Common Law Fraud, Negligent Misrepresentation and Violation of Mass. Gen. Laws ch. 110A, § 410(a)(2)

A number of Tutor Perini's state law claims are based on the same alleged misrepresentations and omissions that form the basis for its securities fraud claims. Specifically, in Counts II and III of its complaint, Tutor Perini asserts claims against the defendants for fraudulent misrepresentation and fraudulent concealment based on their alleged misrepresentations and omissions regarding ARS.  Additionally, in Count IV, Tutor Perini is seeking to hold BAS liable for negligent misrepresentation based on allegations that "BAS misrepresented the suitability of ARS for Tutor Perini's account

and failed to inform Tutor Perini of the risks associated with ARS in late 2007 and early 2008[,]" and in Count VIII, Tutor Perini claims that BAS violated the Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410(a)(2), by selling ARS to the plaintiff in Massachusetts "by means of unlawful misrepresentations and omissions." (Compl. ¶¶ 70, 92). The defendants argue that each of these claims is defective and must be dismissed because Tutor Perini has failed to adequately plead either that the defendants misrepresented or omitted any material facts, or that the plaintiff relied on the alleged misstatements. (Def. Mem. at 29). As detailed above with respect to the plaintiff's securities fraud claims, this court has determined that Tutor Perini has pled material misrepresentations and omissions, as well as reliance, in compliance with Rule 9(b). Therefore, to the extent its claims require the plaintiff to plead these elements,[11] the plaintiff has met its burden.

### iii.    Count V: Claim for Violation of Mass. Gen. Laws ch. 93A

In Count V, the plaintiff claims that "[t]he defendants' failure to inform Tutor Perini about material information of which [they] were aware and BAS' affirmative

---

[11] Reliance is an element of the plaintiff's claims for fraudulent misrepresentation and negligent misrepresentation. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59, 809 N.E.2d 1017, 1031 (2004) ("justifiable reliance is integral to a claim for negligent misrepresentation"); Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458, 772 N.E.2d 1054, 1066 (2002) (to prevail on a claim for fraudulent misrepresentation, plaintiff "must establish that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage" (quotations and citations omitted)). However, Tutor Perini is not required to show reliance in order to prevail under Mass. Gen. Laws ch. 110A, § 410(a)(2). See Marram, 442 Mass. at 53, 809 N.E.2d at 1026-27 ("because G.L. c. 110A, § 410(a)(2), holds the seller liable for inaccurate disclosure or nondisclosure of material information, foremost among the elements that the buyer does not have to prove is reliance." (internal quotations and punctuation omitted)).

misrepresentations to Tutor Perini constitute unfair and deceptive acts or practices" which violate Mass. Gen. Laws ch. 93A ("Chapter 93A").  (Compl. ¶ 75).  Relying on Cabot Corp. v. Baddour, 394 Mass. 720, 477 N.E.2d 399 (1985), the defendants argue that a claim under Chapter 93A cannot be maintained in a securities fraud case because the Massachusetts Uniform Securities Act "was intended to provide comprehensive regulation of the securities field."  (Def. Mem. at 29-30 (quoting Cabot Corp., 394 Mass. at 725, 477 N.E.2d at 402)).  Therefore, they contend that Count V of the complaint must be dismissed.

The Massachusetts Supreme Judicial Court held in Cabot Corp. that Chapter 93A was not intended to apply to securities transactions such as those alleged to violate section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Cabot Corp., 394 Mass. at 720, 477 N.E.2d at 399.  Subsequently, however, in 1987, the Massachusetts legislature amended Chapter 93A in order to cover sales of securities.  See Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 760 (1st Cir. 1997) ("In 1987, the Massachusetts legislature amended the definitions section of [Chapter 93A] so that 'trade' and 'commerce' now include 'the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of . . . any security.'").  Therefore, the defendants have failed to show that the plaintiff is precluded from maintaining a Chapter 93A claim as a matter of law, and their motion to dismiss Count V should be denied.[12]

---

[12]  In their Reply Memorandum, the defendants argue that the Chapter 93A claim should be dismissed nonetheless because it is premised on fraudulent conduct, which the plaintiff has

### iv.    Counts VI and VII: Claims for Civil Conspiracy

The defendants also have moved to dismiss Tutor Perini's claims for civil conspiracy, which are alleged in Counts VI and VII of the complaint.  By its first claim of conspiracy, Tutor Perini alleges that "Defendants reached an agreement, and acted in concert" to commit the alleged fraud on the plaintiff, and that the "defendants gave substantial assistance and encouragement to each other with the knowledge that such assistance was contributing to a common plan to defraud Tutor Perini."  (Compl. ¶¶ 81-82).  By its second claim, Tutor Perini alleges that the defendants, "by moving ARS out of BAS' inventory into Tutor Perini's account while reaping the joint benefits of having Tutor Perini as a client for BAS and a borrower for [BANA,]" acted in unison to "exercise[ ] coercion over Tutor Perini that they would not have had if they had been acting independently."  (Id. ¶¶ 87-88).  While Massachusetts law recognizes both types of civil conspiracy, this court finds that even if the claims are viewed under the notice pleading standard of Rule 8(a), the complaint fails to state a plausible claim for relief under either theory.

Tutor Perini's first claim for conspiracy "involves 'concerted action, whereby liability is imposed on one individual for the tort of another.'"  Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 363 (D. Mass. 2002) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 188, 689 N.E.2d 833, 836 (1998)) (internal quotations omitted).

---

failed to plead with particularity.  (Def. Reply Mem. at 20).  For the reasons discussed supra, this argument is unpersuasive and does not warrant dismissal of Count V.

"Under this theory, a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement." Id. (quoting Mass. Laborers' Health & Welfare Fund v. Philip Morris, 62 F. Supp. 2d 236, 244 (D. Mass. 1999)). The "[k]ey to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." Id. (quoting Kurker, 44 Mass. App. Ct. at 189, 689 N.E.2d at 837). Therefore, to prevail on such a claim, the "plaintiff must establish a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Id. (quoting Kurker, 44 Mass. App. Ct. at 189, 689 N.E.2d at 837) (additional quotations and citation omitted).

In the instant case, Tutor Perini has not alleged facts, as opposed to conclusory allegations, showing that the defendants had a common plan to defraud the plaintiff or that BANA substantially assisted BAS in doing so. While the plaintiff has alleged that each of the defendants independently failed to inform Tutor Perini about the risks of investing in ARS, it has not alleged any facts to establish that they had an agreement to withhold information from the plaintiff or otherwise acted in concert.

The plaintiff argues that a conspiracy between the defendants to defraud can be inferred from allegations that BANA issued alerts recommending that BAS limit its clients' exposure to ARS, as well as from allegations that Tutor Perini had a longstanding relationship with BANA involving trust, that BANA and BAS both had knowledge about the ARS market, and that BANA recommended BAS as a broker for Tutor Perini's invest-

ments.  (Pl. Opp. Mem.  at 30).  However, the defendants' knowledge about the ARS

market, and the fact that Tutor Perini trusted BANA and relied on its recommendation to

use BAS as its broker, do not imply the existence of an agreement or encouragement to

commit fraud.  Moreover, this court finds that the allegations regarding BANA's ARS

alert undermine the plaintiff's claim of conspiracy.  As Tutor Perini alleges, in January

2008, after a BANA Chief Investment Office issued an alert to the company's investment

professionals recommending that they eliminate their clients' exposure to ARS,

employees of BANA forwarded the alert to traders on the ARS Desk at BAS.  (Compl. ¶

52).  Allegedly, however, "[a]s a sign of the conflicting interests within the defendants,"

BAS failed to forward the information on to its clients or to warn them about the risks of

ARS.  (Id.).  Instead, according to Tutor Perini, "one senior member of the BAS ARS

Desk staff reacted by stating: 'Whoever sent this out should be shot!! Are they trying to

put us out of business?'"  (Id.).  These facts imply that BANA was seeking to act in the

best interests of Tutor Perini and other BAS clients, but that its efforts were thwarted by

the "conflicting interests" of employees working at BAS's ARS trading desk.  Thus,

Tutor Perini's allegations are inconsistent with a claim that the defendants were acting in

concert or that BANA was providing BAS with substantial assistance or encouragement

to commit a fraud upon the plaintiff.

    The second type of civil conspiracy, which Tutor Perini alleges in Count VII, is a

coercive type of civil conspiracy, which "is 'akin to a theory of common law joint

liability in tort.'"  Grant, 183 F. Supp. 2d at 362 (quoting Aetna Cas. Sur. Co. v. P&B

Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).  This type of conspiracy is a "'rare' and a 'very limited' cause of action."  Id. at 363 (quoting Mass. Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 244).  In order to state a claim, "[t]he plaintiff must allege . . . that by mere force of numbers acting in unison the defendants exercised some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had."  Id. (quoting Mass. Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 244) (additional quotations and citation omitted).  However, "[e]vidence of joint activity, even tortious activity, is insufficient to prove a coercive conspiracy."  Id.

Again, this court finds that the plaintiff has failed to allege anything more than conclusory allegations to support its claim of conspiracy.  As in the case of Tutor Perini's first conspiracy claim, any suggestion that the defendants were acting in unison is undermined by allegations regarding BANA's efforts to alert clients of the risks of exposure to ARS.  Additionally, Tutor Perini has not alleged any facts to show that there was "force of numbers" or that as a result of those numbers, the defendants "had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently."  Id. (quoting Aetna Cas. Sur. Co., 43 F.3d at 1564) (additional quotations and citation omitted).  Therefore, this court recommends that Counts VI and VII be dismissed.

### v.     Count IX: Claim for Breach of Contract

In Count IX, Tutor Perini has asserted a claim against BAS for breach of contract, which appears to be based on unidentified provisions of the Credit Agreement. Specifically, in support of this claim Tutor Perini alleges as follows:

> 96.    BAS was contractually limited by the terms of Tutor Perini's investment objectives, which were embodied in the Credit Agreement, to recommend only those securities that complied with Tutor Perini's objectives.

> 97.    Tutor Perini only authorized BAS to purchase the securities that fit its mandate, and at no time did Tutor Perini confer on BAS discretion to purchase investments that did not fit its approved profile of highly safe and liquid securities.

> 98.    BAS' investment of Tutor Perini's funds in ARS, which was done without knowing authorization from Tutor Perini, was a breach of contract.

(Compl. ¶¶ 96-98).  Thus, according to the plaintiff, BAS breached an agreement to be bound by the investment guidelines set forth in the Credit Agreement.  (Pl. Opp. Mem. at 30).  For the reasons that follow, this court agrees with the defendants' assertion that these allegations fail to state a claim.

To the extent Tutor Perini is claiming that BAS breached the terms of the Credit Agreement, any such claim should be dismissed.[13]  As an initial matter, Tutor Perini does not allege that BAS was a party to the Credit Agreement, and the Credit Agreement itself indicates that BAS was not a party thereto.  (See Credit Agreement at 1 (showing that

---

[13]  Because Count IX is based on a contract and not on the defendants' alleged misrepresentations and omissions, this court finds that it is subject only to the notice pleading requirements of Rule 8(a).

Agreement was entered into among Tutor Perini, certain of its subsidiaries, BANA, and certain "other lenders," with BAS acting only as "Sole Lead Arranger and Book Manager").[14]  Furthermore, Tutor Perini has not alleged any facts beyond the vague and conclusory allegations described above specifying what investment objectives "were embodied in the Credit Agreement" or how BAS's purchases of ARS failed to comply with the stated objectives.  Accordingly, the plaintiff has not alleged that BAS had any obligations under the Credit Agreement or that it breached those obligations.

To the extent Tutor Perini claims that BAS agreed to be bound by the Credit Agreement's investment guidelines under the terms of a separate agreement, it has failed to allege any facts to show the existence of such an agreement or how any such contract adopted terms from the Credit Agreement.  Therefore, Tutor Perini has failed to state a plausible claim for breach of contract, and this court recommends that Count IX of the complaint be dismissed.

### vi.   Count X: Claim for Conversion

Tutor Perini's final state law claim, which is set forth in Count X of the complaint, alleges that BAS engaged in conversion by "unlawfully and intentionally convert[ing] Tutor Perini's funds for its own use."  (Compl. ¶ 101).  In order to state a claim for conversion, the plaintiff must allege facts showing that the defendant improperly exercised dominion or control over the plaintiff's property.  See Third Nat'l Bank of

---

[14]  The Credit Agreement can be found at Exhibit Q to the Declaration of T. Peter R. Pound in Support of Defendants' Motion to Dismiss (Docket No. 38).

Hampden Cnty. v. Cont'l Ins. Co., 388 Mass. 240, 244, 446 N.E.2d 380, 383 (1983)

("Conversion requires the exercise of dominion or control over the personal property of

another").  Because the plaintiff has failed to allege any such facts, its claim for

conversion should be dismissed.

Although Tutor Perini alleges that BAS purchased ARS for its account, it does not

allege that BAS, as opposed to Tutor Perini, exercised control over the plaintiff's funds or

the securities in its account.  Rather, the plaintiff claims that it relied on the defendants'

misrepresentations and omissions regarding ARS, and that it would never have invested

in such securities if the defendants had disclosed the risks of such investments.  (Compl.

¶¶ 8, 59).  These allegations demonstrate that Tutor Perini made the final decision as to

whether to purchase ARS for its account and maintained control over its investments.

Therefore, they are inconsistent with a claim of conversion.[15]

Citing Cahaly v. Benistar Prop. Exch. Trust Co., Inc., 68 Mass. App. Ct. 668, 864

N.E.2d 548 (2007), Tutor Perini argues that under Massachusetts law, "exceeding one's

contractual authorization to handle property in a manner that substantially interferes with

the owner's right to control that property is a valid theory of conversion."  (Pl. Opp.

Mem. at 30).  It further contends that this "is what is pled: the Bank exceeded the scope

---

[15]  In connection with its breach of contract claim, Tutor Perini alleges that "BAS' investment of Tutor Perini's funds in ARS, which was done without knowing authorization from Tutor Perini, was a breach of contract."  (Compl. ¶ 98).  However, this conclusory assertion regarding a lack of authorization is not supported by any of the plaintiff's allegations of fact and is inconsistent with its claims of reliance.  Therefore, this court finds that it provides no support for the plaintiff's conversion claim.

of its authority by knowingly investing in securities that exceeded Tutor Perini's investment mandate." (Id.).  However, in Cahaly, the contractual agreements at issue "transferred the plaintiffs' control over their sale proceeds to [the defendant], with a time limit on that control and restrictions on the use of those funds during the time of [the defendant's] possession."  Cahaly, 68 Mass. App. Ct. at 679.  Accordingly, at the time the defendant exceeded its authorization by engaging in unauthorized uses of the plaintiffs' sale proceeds, the defendant was in possession of those proceeds and controlled the improper use of those funds.  See id.  Here, the plaintiff has not alleged that it relinquished control over its funds or its account to BAS.  Therefore, this court recommends that Count X be dismissed.

## IV.  CONCLUSION

For all the reasons described herein, this court recommends that the "Defendants' Motion to Dismiss" (Docket No. 36) be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that Counts VI, VII, IX and X be dismissed, but that the motion otherwise be denied.[16]

---

[16]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-

  / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).